# Exhibit B

**TO THE APPLICABLE DUTY COMMERCIAL COURT OF BARCELONA**

I, Mr. David Vaquero Gallego, Attorney and legal representative of **REUTERS NEWS & MEDIA SPAIN, S.L.U.**, which representation I shall certify via apud acta power of attorney, acting under the instructions of Antonio Faixó Martínez, ICAVOR Bar Association No. 1994, appear before this Court and hereby **STATE** as follows in accordance with the law:

Via the present document, and pursuant to the provisions set forth in articles 399 et seq. of the Ley de Enjuiciamiento Civil [Law of Civil Procedure — LEC], I hereby file an **ORDINARY CIVIL ACTION** against **Mr. RAFAEL BENITEZ MARCHANTE**, holder of ID card 44032579E, domiciled at Rua Gravato 11, bajos derecha, 1400-193 Lisbon (Portugal), in exercise of declaratory judgment for judicial acknowledgment of the validity of the right of use of the photographs taken by the respondent for my constituent during the period they had a partnership agreement, all of the foregoing based on the following

**PRIOR**

**FACTS. — EXPRESS SUBMISSION OF THE PARTIES TO THE COURTS OF BARCELONA**

The present action is based on the agreement signed between the parties on 07.11.05. Clause 8 of the aforementioned agreement expressly stipulates the submission of the parties to the courts of Barcelona.

The aforementioned agreement is enclosed as **DOCUMENT No. 1**.

In addition, article 54.1 of the Law of Civil Procedure provides that:
*"The legal rules relating to territorial competency shall only apply in the absence of express or tacit submission of the parties to the courts of a specific district. Excepted from this are the rules set forth in items 1 and 4 to 15 of section 1 and section 2 of article 52 and such others as this or any other law may expressly make mandatory. Nor shall*

1

*express or tacit submission be valid in those matters required to be adjudicated in oral proceedings."*

Consequently, and since neither the rules set forth in items 1 and 4 to 15 of section 1, nor in section 2 of article 52 of the Law of Civil Procedure, are applicable to the present proceeding, the express submission agreed to between the respondent and my constituent in favor of the courts of Barcelona is therefore binding and in accordance with the Law.

In addition, this action is filed before the Commercial Courts since it is a matter pertaining exclusively to them, relating as it does to a judicial decision in the area of intellectual property law.

## ONE. — CONCERNING THE PARTIES

My constituent is a company dedicated mainly to the creation of topical press articles and management of photographs for the media as part of the well-known international Reuters group.

However, it should be explained that REUTERS NEWS & MEDIA SPAIN, S.L.U. was incorporated on 10.22.21 and that all of the rights and obligations of EDITORIAL ARANZADI, S.A. in connection with that activity were transferred to it on 04.01.22, since Editorial Aranzadi, the company previously owned by the Reuters group in Spain, solely retained the editorial business activity, for which it is well known in Spain.

Logically, the rights of reproduction of the respondent's photographs were included in that transfer.

Appended as **DOCUMENT No. 2** is the transfer agreement of the business unit between both companies.

2

EDITORIAL ARANZADI, S.A. had in turn received that business unit from THOMSON REUTERS MARKETS ESPAÑA, S.L.U. on 08.01.18.

Appended as **DOCUMENT No. 3** is the transfer agreement of the business unit between both companies.

THOMSON REUTERS MARKETS ESPAÑA, S.L.U. had in turn received that business unit from REUTERS EUROPE, S.A. on 07.01.09, via non-monetary contribution from REUTERS EUROPE, S.A. as partner of the former.

Appended as **DOCUMENT No. 4** is the document concerning the raising of capital and contribution of the aforementioned business unit.

Finally, it must be stated that REUTERS EUROPE, S.A. had previously received that business unit from REUTERS ESPAÑA, S.A.

Appended as **DOCUMENT No. 5** is a communication from that company to the Tax Agency explaining the previous corporate movements by which that transfer occurred.

Ultimately, this business unit of the Reuters Group in Spain was transferred from one company to another over the course of these years, my constituent being the one that currently holds the rights and obligations of the aforementioned business. And this includes the rights and obligations in connection with the agreement that was signed with the respondent and the rights of reproduction of his photographs, to which we will refer later.

For his part, the respondent is a professional photographer who collaborated with the Reuters Group as a freelancer for several years

Appended as **DOCUMENT No. 6** is a printout from the LinkedIn website containing the respondent's personal professional webpage, where he is identified as "Freelance Photography".

3

It should be pointed out that the name by which the respondent is known and introduces himself is "Rafael Marchante", although he is actually called Rafael Benítez Marchante. We will refer to him in one or other way in this lawsuit, but he is one and the same person.

**TWO. — THE AGREEMENT BETWEEN THE PARTIES**

As mentioned in the Prior Facts, on 07.11.05 the parties signed a partnership agreement that we have submitted as Document No. 1.

It should be pointed out that the party that signed the agreement at that time was Reuters España, S.A., but the agreement already provided for the rights and obligations extending to any Reuters Group company.

In any case, put briefly the agreement provided as follows:

2.1.  That the agreement applied to photographs the photographer had previously taken on assignment by a Reuters Group company, regardless of whether they were individual photographs or photo shoots. Clause 1.2:

*"The following terms and conditions shall apply to all photographs with effect from the signing date, regardless of whether they are "photo shoots" or "individual photographs", that have been supplied or have been taken in the past during an assignment by any Reuters Group company, including photographs taken under direction or following instructions from Reuters or a Reuters Group company or with Reuters equipment."*

*2.2.*  The photographer was obliged to submit to Reuters the best photographs taken in each new assignment given to him by Reuters. Clause 1.4:

*"After each assignment, you shall select those Photographs that in your reasonable opinion are the best Photographs taken during that assignment and shall supply*

4

*them to Reuters."*

2.3. The photographer gave Reuters a license to exploit those photographs worldwide, during the term of duration of the photographer's intellectual property right. Clause 2.1:

*"You hereby grant Reuters for its own benefit or that of any Reuters Group company, to the extent permitted in law, a worldwide license to exploit the rights of the Photographs (specifically to reproduce, distribute, sell, lease, loan, use, edit and store electronically or by any other means, exhibit and communicate them to the public, transmit, …) for the duration of the author's copyright over the Photographs, including the right to sublicense them on an exclusive basis."*

2.4. That license was exclusive with respect to the "Reuters photographs" and not exclusive with respect to any excess ones. Clause 2.2. It should be pointed out that the "Reuters photographs" were those that were assigned because they were the best from each assignment, and the excess ones were the others taken on each assignment:

*"The rights granted under clause 2.1 are exclusive to Reuters in connection with the Reuters Photographs and are not exclusive with respect to the Excess ones."*

2.5. Reuters was required to pay regalías or royalties (in the present lawsuit we interchangeably describe them one way or the other, as it is well known that the term royalties is usually used in practice despite the fact that the appropriate Spanish word is regalías) to the photography for each "sale" of a copy of a photograph of a client of Reuters. The aforementioned royalty was 25% of the net amount of sales and was paid quarterly. Clauses 3.2 and 3.3:

*"Reuters shall pay him or ensure that another Reuters Group company pays him a royalty. The amount shall be calculated monthly and (subject to the provisions set forth in clause 3.3) shall be 25% of Net Sales. Net Sales means …"*

*"The amount is paid quarterly …"*

5

2.6.  The agreement would remain in effect as long as the photographer took photographs on assignment from Reuters. But at the time the agreement relating to that partnership ended, the rights of use of the existing photographs and the obligations to pay royalties would be maintained for the agreed periuod (in other words for the term of duration of the intellectual property right). Clause 6: *"This agreement shall begin on the date it is signed by both parties and shall remain in effect for as long as assignments are carried out for Reuters or a Reuters Group company as a freelance photographer. Should the completion of assignments for Reuters cease, the right to receive the payments set forth in clause 3 shall be maintained, like the rights conceded in clause 2."*

2.7.  The agreement was subject to Spanish law and any dispute had to be resolved before the courts of Barcelona. Clause 8:

*"This agreement is subject to the laws of Spain and any dispute in connection with it shall be subject to the jurisdiction of the courts of Barcelona."*

As we can see, this relates to a mixed agreement with two different purposes: a partnership or service provision agreement under which the photographer commits to attend those events to which he is assigned by Reuters in order to take photographs and deliver them to Reuters, and an exclusive license granting the rights to reproduce those photographs.


**THREE. — AGREEMENT TO SETTLE THE CONTRACT WITH RESPECT TO THE PROVISION OF SERVICES**

On 03.26.01 the parties signed an agreement to terminate the 2005 agreement with respect to the partnership or provision of services. In other words, the respondent ceased to provide services as a freelance photographer for the Reuters Group.

That agreement is appended as **DOCUMENT No. 7**.

It should be pointed out that that agreement was formally signed by Reuters News & Media Unipessoal LDA, which is the Reuters Group company in Portugal, because the respondent at that time resided and currently also resides in Portugal. Nonetheless, the agreement affects the respondent's relationship with all Reuters Group companies, including my constituent, as set forth in the preamble:

*"In order to make effective the clauses of this agreement that benefit another company of the Group, the Company hereby signs as agent and representative of the aforementioned company of the Group."*

Put briefly, the agreement established as follows:

3.1.  The freelance partnership relationship ended on 11.30.20. Clause 1.

3.2.  The party shall have no further relationship, except with respect to the rights of reproduction and royalties on the photos created within the scope of the agreement of 07.11.05. Clauses 2 and 13:

*"The parties agree that the Contractor shall cease to provide photography services to the Company or to any other company of the Group. With the exception of the Contractor's copyright and royalties for the photographs created within the scope of the services provided to Reuters, and the rights and obligations in the Royalties Agreement of 07.11.05, the Contractor declares that he has nothing to claim …"*

*"The parties acknowledge that this agreement establishes the entire relationship between the parties and replaces all prior discussions between the parties, except as it pertains to the Royalty Agreement that remains fully valid."*

Ultimately, it is obvious that the agreement had as its purpose the termination of the partnership or service provision relationship as freelance photographer, but expressly retaining the rights and obligations with respect to the photographs taken during the relationship kept under the 2005 agreement.

It should be borne in mind that this matches the provision already contains in the 2005

7

agreement with respect to the maintenance of those rights (use of photographs) and obligations (payment of royalties) should the partnership agreement end at any time.

**FOUR. — CONFLICT BETWEEN THE PARTIES WITH RESPECT TO THE VALIDITY OF THE RIGHTS TO REPRODUCE THE PHOTOGRAPHS**

Despite the fact that the foregoing documents were clear and that the respondent expressly acknowledged the maintenance of the rights of my constituent to reproduce and sell his photographs, with the obligation to pay him royalties in each case, a dispute has existed over the last two years between the parties with respect to this, based on the fact that the respondent attempted to bring about a totally illegal and invalid termination of this agreement, one that in fact involves an unacceptable and unilateral discontinuance.

The aforementioned conflict or dispute is based on the letter forwarded by the respondent to my constituent on 04.30.21, in other words one month after having signed the agreement to terminate the service provision relationship.

That letter is appended as **DOCUMENT No. 8**.

In that letter the respondent states as follows:

- The title is *"Charge relating to the royalties agreement for freelance photographs signed on July 11, 2005."* The word "charge" is inaccurate, because in legal terms a complaint is the report of a crime made before the police or the court, and no such reference can be made in civil law.

- *"… I hereby proceed to file a charge relating to the royalties agreement for photographs described above, this rescission being effective from May 30, 2021 the date on which it ceased to be effective."* Despite the fact that he again uses

8

the word "charge", that is not appropriate in a civil law context, he also uses the word "rescission", from which he is apparently attempting to rescind the agreement unilaterally.

Before communicating his decision to rescind the agreement, he requested Reuters to send him a report on all sales made of his photographs.

However, we note that the respondent cites no causal ground for his attempted rescission. He does not allege any breach, nor does he mention any specific clause in the agreement, nor does he cite any applicable legal regulation. He restricts himself to attempting to communicate his unilateral decision to rescind, which is legally tantamount to a unilateral discontinuance of the agreement.

And this is obviously unlawful and ineffective, because the agreement makes no provision for the parties being able to discontinue their obligations with respect to the rights to the photographs. To the contrary, both the agreement and the clause for termination of the provision of services expressly provide that Reuters shall retain the rights to reproduce the photographs during the agreed term (being the same term as the legal duration of the author's reproduction rights).

Ultimately, it is indisputable that the aforementioned letter could not have any legal effect whatsoever.

Nonetheless, the respondent subsequently sent several claims to my constituent insisting that the agreement had been rescinded by that letter and that my constituent should cease using the photographs.

This is what has obliged that party to file this complaint. We cannot accept the insistence of this person on the basis of an unlawful claim, based on an ineffective letter, when my constituent's rights remain valid and should not be called into question. We therefore need a judicial declaration certifying the legal validity of those rights vis-à-vis the

9

respondent.

Specifically, the subsequent communications between the parties demonstrating this conflict are as follows:

4.1.   Email of 05.03.21 from the attorney Fatima Valadas, acting on behalf of Rafael Marchante, sent to Reuters Portugal, enclosing the letter of 04.30.21.

We note that the email states: "I enclose the letter terminating the royalties agreement signed between the parties in July 2005", without further explanation. Obviously, we refer to our previous comments with respect to the ineffectiveness of that letter and, consequently, the aforementioned email.

4.2.   Email of 05.26.21 of that attorney asking whether Reuters had received the previous email.

4.3.   Email of 05.29.21 of Katharine Larsen on behalf of Reuters, responding that the royalties agreement would remain valid because that is what the parties had agreed, in other words rejecting the termination of the aforementioned agreement.

The three aforementioned emails are appended in a block as **DOCUMENT No. 9**.

4.4.   Email of 11.24.21 of Marcin Woroniwcki on behalf of Reuters to the respondent, stating that the agreement remains valid and that they had sent him the sales and royalties report he had requested.

The aforementioned email is appended as **DOCUMENT No. 10**.

4.5.   Email of 08.05.22 from Rafael Marchante to Reuters, stating that he had sent the termination of the agreement in writing on 05.30.21 and had requested Reuters to cease the use and exportation of his photographs, and that Reuters has

10

acknowledged receipt but failed to comply with the request, and insisting that they cease use immediately.

4.6.  Email of 08.09.22 from Marcin Woroniwcki on behalf of Reuters to the respondent, reminding him that a response had already been sent on 11.24.21 stating that the agreement remains valid and had not been terminated.

The two aforementioned emails are appended in a block as **DOCUMENT No. 11**.

4.7.  Email of 09.08.22 from Rafael Marchante replying to the above, insisting that he had terminated the agreement in writing with effect from 05.30.21 and that Reuters had no right to reproduce the photographs.

That email is appended as **DOCUMENT No. 12**.

4.8.  Letter of 06.19.23 from the attorney James H. Bartolomei, on behalf of the respondent, asserting that the agreement had been settled via the latter of April 2021 and that Reuters was violating the respondent's intellectual property rights by using his photographs despite the various requests concerning this.

That letter is appended as **DOCUMENT No. 13**.

4.9.  Letter dated 08.01.23 from the attorney signing the present claim in response to the foregoing letter. In that letter we insisted, as we could hardly fail to insist, that the aforementioned letter of 04.30.21 was ineffective and that the agreement therefore remained valid.

That letter is appended as **DOCUMENT No. 14**.

As we can see, all these communications have followed the same line: the respondent and his attorneys assert that the aforementioned letter of 04.30.21 served to settle the agreement and consequently extinguished the rights of Reuters, while Reuters has on

11

each occasion asserted that that letter was not valid and that the contractual rights survive.

In the legal grounds section of this complaint we analyze these matters from a legal standpoint, but we have made it clear that in our opinion, and demonstrably so in view of the agreement signed between the parties, the photograph reproduction rights remain valid, together with the corresponding obligation to pay royalties for use/sale thereof,, that the letter of 04.30.21 had no effect whatsoever and that claims to the contrary lack valid legal grounds.

Finally, we would like to indicate that the conflict bears no relationship to acknowledgment of the respondent's copyright. Reuters always states who is the author of the photographs held and sold by it, respecting acknowledgment of copyright. The respondent has not complained or represented any problem whatsoever on this matter.

**FIVE. ON THE MATERIAL ERROR IN THE AMOUNT WITH RESPECT TO THE ROYALTIES PAID**

As can be seen, the respondent's email dated 09.08.22 and the letter from attorney James H. Bartolomei dated 06.19.23 makes reference to an alleged breach by Reuters in having incorrectly paid royalties to the respondent.

Specifically, the letter asserts that between 2005 and 2016, Reuters only paid the respondent 15% of sales is royalties, when the agreed amount was 25%. The email only levels the accusation that half of the royalties have been paid, without details.

These are the only occasions on which the respondent or one of his attorneys makes reference to this matter, since the previous communications never asserted any defect in the payment of royalties.

Moreover, we note that in the email of 09.08.22, the respondent attempts to distort the facts by asserting that the settlement of April 2021 was due to alleged breach of the payment of royalties, and this is false.

As has been fully demonstrated, the settlement letter is strictly a case of unilateral discontinuance without cause. No mention is made there of any contractual breach nor is mention made of royalties. Nor in the communications that followed in 2021 nor in any of those of 2022 until 09.08.22 was any mention made of this. Consequently, it is incorrect that the attempted settlement was based on breach by my constituent.

Moreover, having analyzed the aforementioned timeline, we can see that it was in April 2021 that the invalid letter of settlement without cause was sent; that it was in November 2021 when my constituent sent information on sales and royalties paid to the respondent; and that it was in September 2022, in other words a year later, that the respondent for the first time complained of the existence of an error and that Reuters had failed to pay him the correct amount in royalties.

It is therefore clear that the two things are not linked: the letter was an attempt at unilateral discontinuance without cause, while the discovery of a possible error in the amount of the royalties paid such as could constitute a partial breach or otherwise of the agreement is quite another matter.

At all events, it having been clarified that these are two different and separate things, and that the claims and the dispute between the parties relate to whether the letter of April 2021 settled the agreement or not, and that they do not relate to the amount of the royalties, we need to analyze whether there was in fact an error in the payment of royalties and what is the consequence of that fact.

Accordingly, we must state that an error was indeed committed by the Reuters Group for several years, during which the respondent was paid an amount in royalties that was incorrect and less than that agreed Specifically, he was paid 15% on sales, when it should

13

have been 25%.

In our opinion, we must speak of a material error because it is obvious that there was never any intentional noncompliance by Reuters, since royalties have always been paid to him, but it was simply the case that for a period of time the amount paid was not the correct one.

At all events, notified of this error within the last few months, the Reuters Group has proceeded to rectify it, paying the respondent the amount he failed to receive, in other words the additional 10% not paid at the time.

Appended as **DOCUMENT No. 15** is the proof of payment.

Appended as **DOCUMENT No. 16** is the list of sales and royalties containing a breakdown of the calculation of the amount rectified.

This party has proceeded to make that payment to rectify the error that was committed, and we understand that that error was just that, an error, and that it cannot be interpreted as contractual breach such as could warrant a settlement of the agreement.

It could not be interpreted as breach because there has been no case of absolute and essential nonpayment, so much as an incomplete payment, since rectified.

But we can make this very clear: in the improbable event of it being possible to interpret that error as a breach of sufficient magnitude as to settle the agreement, the respondent has never formally settled the agreement (understood as the agreement for the reproduction of photographs) on that ground. There has never been any communication in which the respondent simply stated that there is breach and that pursuant to article 1124 Cc it is necessary to settle the agreement. That has not existed.

Consequently, given the existence of a contractual provision complied with in an incomplete manner, but that has now been rectified, the respondent no longer has any

14

possibility to attempt to settle the agreement on that ground.

To reiterate, the conflicts of the last two years between the parties with respect to the validity of the agreement does not derive from that possible breach, so much as the letter of discontinuance without cause of April 2021, that is invalid.

Finally, we would like to recall that this error that has now been rectified concerns royalties from a previous period, not the current one. Over the last few years the royalties have in fact been paid 100% correct, and without complaint from the respondent.

Appended as **DOCUMENT No. 17** is the proof of payment in 2023 (a single payment has been made for the first quarters because the first quarter did not in and of itself accrue an amount sufficient for an individual payment), and as **DOCUMENT No. 18** is the list of royalties accrued and paid in 2023. It should be pointed out that a difference exists with respect to the withholding of taxes.

The following apply to the aforementioned facts:

## LEGAL GROUNDS

**I.- JURISDICTION**The Civil Jurisdiction Division is competent pursuant to the provisions set forth in article 9.2 of the Ley Orgánica del Poder Judicial [Organic Law of the Judicial Branch — L.O.P.J.], given that the instant matter is not attributed to another Jurisdictional Division.

**II.-COMPETENCY.**The Court to which we are writing is competent pursuant to Clause

Eight of the agreement signed between the parties, by means of which submission to the Courts of Barcelona was expressly agreed.

And the Commercial Court is competent pursuant to article 86 bis LOPJ, since the matter treated in this lawsuit is one of intellectual property law.

**III.- CAPACITY, REPRESENTATION AND PROCEDURAL ADMISSIBILITY.** Articles 6, 7, 23 and 31 of the Law of Civil Procedure.

**IV.- LEGAL STANDING.** Active legal standing is held by **REUTERS NEWS & MEDIA SPAIN, S.L.U.** as the owner of the right whose acknowledgment is requested in this complaint.

And passive legal standing is held by **Mr. RAFAEL BENITEZ MARCHANTE** as author of the photographs that call into question the validity of my constituent's right.

**V.- AMOUNT.** The amount of the present lawsuit is not determined since none of the rules set forth in article 251.1 of the Law of Civil Procedure are applicable in adjudicating it.

**VI.- PROCEEDINGS.** In consequence of the foregoing, the action must be heard in accordance with the rules of Ordinary Declaratory Judgment since, pursuant to article 249.2 of the Law of Civil Procedure, it relates to a claim in an undetermined amount.

**VII.-SUBSTANCE OF THE MATTER:**

The following are applicable:

General rules on obligations: Articles 1088, 1089, 1091, 1100, 1101, 1102, 1104, 1106, 1108 and the correlative provisions in the Civil Code with respect to obligations arising from agreements, that have force of law between the parties and oblige compliance thereof.

Articles 1254 and 1255 of the Civil Code: Under which an agreement exists from the time

16

one or more persons consent to place themselves under obligation with respect to one or other of them, to give something or to provide a service, being able to establish such agreements, clauses and conditions as are deemed appropriate.

Article 1258 of the Civil Code: Under which agreements are formalized purely by consent, and from that moment they require compliance not only with what is expressly agreed, but also of all such consequences that, by their nature, are in accordance with good faith, customary practice and the law.

Article 1124 of the Civil Code: That empowers the person meeting their obligations in respect of functional or reciprocal obligations to demand corresponding provision from the party in breach, or settlement of the obligation.
In other words, when there are two options where breach of contract exists: comply by rectifying what has previously been left incomplete with continuation of the agreement, or settlement thereof. Consequently, there is no automatic settlement, so much as it can only be settled if so decided by the other party and formally communicated.

Article 26 of the Ley de Propiedad Intelectual [Intellectual Property Law — LPI]: The rights of exploitation of the work shall last for the entire life of the author and 70 years after his or her death.
Consequently, that is the term of duration of the rights of reproduction held by my constituent with respect to the photographs taken by the respondent during the assignments he received from Reuters and that he assigned to Reuters.

Article 43 of the Intellectual Property Law: The rights of exploitation of the work may be transmitted by inter vivos acts in the manner, at the time and in the territorial context to be decided.

Article 45 LPI: All assignments of rights must be formalized in writing.

Article 46 LPI: The assignment confers on the author a proportional share in the revenue

17

from the exploitation, in the amount agreed with the assignee.

Article 48 LPI: The exclusive nature of the assignment must be expressed.

Article 48 bis LPI: The author may settle an exclusive assignment if the work is not exploited by the assignee.

We interpret this article in the contrary sense: if the work is in fact exploited by the assignee, the author cannot annul the assignment of rights. Given that Reuters is exploiting the work in this case, the author cannot annul that assignment.

Article 128 LPI: The author of individual photographs may authorize reproduction thereof for a period of 25 years from the January 1 following the date on which the photographs were taken.

Consequently, those individual photographs that could have been taken by the respondent during assignments from Reuters and that he would have assigned to Reuters in accordance with the existing agreement, can be reproduced by Reuters for 25 years.

At all events, we understand that it must be presumed that all of the respondent's photographs are photographic works and not individual photographs, because he is a professional photographer and when he took photographs by assignment from Reuters he was providing a professional services.

Judgment No. 135/2021 dated 07.14.21 issued by the 14th Commercial Court of Madrid. This relates to a legal action between a professional photographer who had a service provision relationship with Reuters as an independent or freelance photographer for a period of time, and consequently an employment relationship. The freelance photographer relationship was very similar to that maintained between Reuters and the respondent herein.

In that case there was no written agreement describing the assignment of rights to the photographs when he was independent, but even so the court found that the will of the

parties should be interpreted to the effect that an assignment of the right of reproduction of the aforementioned photographs existed, because the photographer took them during assignments for Reuters and it should therefore be presumed that they were to be used in Reuters's ordinary course of business as a news agency.

In our case an agreement does in fact exist that clearly provides for assignment of the right of reproduction, but the judgment is interesting because it serves to corroborate that the only reasonable interpretation of a relationship between Reuters and a freelance photographer assigned to take photographs of specific events, is that the photographer assign the rights of reproduction of the aforementioned photographs so that Reuters can use them in its ordinary course of business.

**VIII.-    COSTS.**

Since it is the conduct of the counterpart that has caused my constituent to file the present proceeding, it is applicable to award costs against the respondent, applying by analogy the general rule contained in article 394 of the Law of Civil Procedure.

**IX.- LEGAL APHORISM.** *"Iura Novit Curia" and "Da Mihi Factum, Dabo Tibi Ius."*

Therefore,

**I REQUEST THAT THE COURT** Hold this petition as submitted along with the documents appended to it, that it admit these, and that it hold an **ORDINARY CIVIL ACTION** as having been filed on behalf of **REUTERS NEWS & MEDIA SPAIN, S.L.U.** against **Mr. RAFAEL BENITEZ MARCHANTE**, in respect of a claim for judicial acknowledgment that the right to use the photographs taken by the respondent for my constituent during the period in which they had a partnership agreement is valid, plus costs.

**IN ADDITION**: Should this party have involuntarily incurred any procedural defect, it declares its express will to rectify it as well as to comply with the requirements stipulated in law pursuant to article 231 of the LEC.

**I ASK THE COURT:** To hold the aforementioned declaration as made for all applicable effects.

At Barcelona, October 11, 2023.

NAME FAIXO
MARTINEZ
ANTONIO — TIN
40442861Y

Signed electronically
NAME FAIXO
MARTINEZ ANTONIO
— TIN 40442861Y
Date: 2023.10.11
19:31:50 +02'00'

20

# DECLARATION AND CERTIFICATION

I BRUCE TAYLOR declare that I am a CERTIFIED TRANSLATOR registered with the AMERICAN TRANSLATORS ASSOCIATION.

I am certified to translate from the SPANISH language to the ENGLISH language. My Certification Number is 503180.

I declare to the best of my abilities and belief that this is a true and accurate translation of the Spanish language text of:

   2023-10-11 demanda TR vs Rafael Marchante DMFIRM_409858895(1)

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

This declaration signed this December 1st, 2023, in Los Angeles, California.

Signature of Certified Translator registered with the American Translators Association:

**BRUCE TAYLOR**

* See attached document



Verify at www.atanet.org/verify

NOTE: The Certified Translator registered with the American Translators Association must be acknowledged by a notary public.

**CALIFORNIA ACKNOWLEDGMENT**                                CIVIL CODE § 1189

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
| --- |

State of California

County of _LOS ANGELES_ }

On _DEC.1.2023_ before me, _Lilly Taheri, Notary Public_,
    Date                        Here Insert Name and Title of the Officer

personally appeared _BRUCE TAYLOR_
                                    Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

> LILLY TAHERI
> Notary Public - California
> Los Angeles County
> Commission # 2393980
> My Comm. Expires Feb 14, 2026

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
                Signature of Notary Public

*Place Notary Seal and/or Stamp Above*

———————————— **OPTIONAL** ————————————

*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _DECLARATION AND CERTIFICATION_

Document Date: _DEC.1. 2023_       Number of Pages: _( 1 )_

Signer(s) Other Than Named Above: _N.A_

**Capacity(ies) Claimed by Signer(s)**

| Signer's Name: _BRUCE TAYLOR_ | Signer's Name: _____ |
| --- | --- |
| ☐ Corporate Officer – Title(s): _____ | ☐ Corporate Officer – Title(s): _____ |
| ☐ Partner – ☐ Limited ☐ General | ☐ Partner – ☐ Limited ☐ General |
| ☐ Individual    ☐ Attorney in Fact | ☐ Individual    ☐ Attorney in Fact |
| ☐ Trustee    ☐ Guardian or Conservator | ☐ Trustee    ☐ Guardian or Conservator |
| ☐ Other: _____ | ☐ Other: _____ |
| Signer is Representing: _____ | Signer is Representing: _____ |

©2019 National Notary Association

**AL JUZGADO DE LO MERCANTIL DE BARCELONA QUE POR TURNO CORRESPONDA**

D. David Vaquero Gallego, Procurador de los Tribunales y de la mercantil **REUTERS NEWS & MEDIA SPAIN, S.L.U.**, cuya representación acreditaré mediante apoderamiento apud acta, bajo la dirección letrada de Antonio Faixó Martínez, colegiado ICAVOR nº 1994, ante este Juzgado comparezco, y como mejor proceda, **DIGO:**

Mediante el presente escrito, y de conformidad con lo previsto en los artículos 399 y siguientes de la Ley de Enjuiciamiento Civil, formulo **DEMANDA DE JUICIO ORDINARIO** contra **Don RAFAEL BENITEZ MARCHANTE,** provisto de DNI 44032579E, con domicilio sito en Rua Gravato 11, bajos derecha, 1400-193 Lisboa (Portugal), en ejercicio de acción declarativa para el reconocimiento judicial de que está vigente el derecho de uso de las fotografías realizadas por el demandado para mi representada durante el plazo en que mantuvieron un contrato de colaboración, todo ello con base en los siguientes,

**HECHOS**

**PREVIO. - SUMISIÓN EXPRESA DE LAS PARTES A LOS TRIBUNALES DE BARCELONA**

La presente demanda está basada en el contrato firmado entre las partes en fecha 11.07.05. Dicho contrato establece expresamente la sumisión de las partes a los tribunales de Barcelona, en su cláusula 8.

Se adjunta como **DOCUMENTO Nº 1** dicho contrato.

Asimismo, el artículo 54.1 de la Ley de Enjuiciamiento Civil establece que:
*"Las reglas legales atributivas de la competencia territorial sólo se aplicarán en defecto de sumisión expresa o tácita de las partes a los tribunales de una determinada circunscripción. Se exceptúan las reglas establecidas en los números 1. º Y 4. º A 15. º Del apartado 1 y en el apartado 2 del artículo 52 y las demás a las que esta u otra Ley atribuya expresamente carácter imperativo. Tampoco será válida la sumisión expresa o tácita en los asuntos que deban decidirse por el juicio verbal".*

1

Consecuentemente, y no siendo de aplicación en el presente procedimiento las reglas establecidas ni en los nº 1º y 4º a 15º del apartado 1, ni en el apartado 2 del artículo 52 de la Ley de Enjuiciamiento Civil, resulta vinculante, y conforme a Derecho, la sumisión expresa acordada entre la demandada y mi mandante a favor de los tribunales de Barcelona.

Por otro lado, se presenta esta demanda ante los Juzgados de lo Mercantil por ser de materia exclusiva de los mismos, al tratarse de una declaración judicial en materia de derecho de propiedad intelectual.

**PRIMERO. – SOBRE LAS PARTES**

Mi representada es una empresa dedicada, principalmente, a la realización de noticias de prensa y gestión de fotografías de actualidad para medios de prensa, dentro del reconocido grupo internacional Reuters.

No obstante, hay que explicar que REUTERS NEWS & MEDIA SPAIN, S.L.U. fue constituida en fecha 22.10.21 y que en fecha 01.04.22 se le transfirieron todos los derechos y obligaciones de la empresa EDITORIAL ARANZADI, S.A. respecto a dicha actividad, dado que Editorial Aranzadi, que era la anterior empresa del grupo Reuters en España, se quedaba únicamente con la actividad de negocio de editorial, por la cual es reconocida en España.

Lógicamente, en dicha transmisión se incluían los derechos de reproducción de las fotografías del demandado.

Se acompaña como **DOCUMENTO Nº 2** el contrato de transmisión de unidad de negocio entre ambas empresas.

2

A su vez, EDITORIAL ARANZADI, S.A. había recibido esa unidad de negocio de THOMSON REUTERS MARKETS ESPAÑA, S.L.U. en fecha 01.08.18.

Se acompaña como **DOCUMENTO Nº 3** el contrato de transmisión de unidad de negocio entre ambas empresas.

A su vez, THOMSON REUTERS MARKETS ESPAÑA, S.L.U. había recibido esa unidad de negocio de REUTERS EUROPE, S.A. en fecha 01.07.09, mediante aportación no dineraria de REUTERS EUROPE, S.A. como socio de la primera.

Se acompaña como **DOCUMENTO Nº 4** la escritura de ampliación de capital y aportación de dicha unidad de negocio.

Finalmente, hay que decir que REUTERS EUROPE, S.A. había recibido esa unidad de negocio de REUTERS ESPAÑA, S.A. previamente.

Se acompaña como **DOCUMENTO Nº 5** comunicación de dicha empresa a la Agencia Tributaria explicando los movimientos societarios previos por los cuales se dio dicha transmisión.

En definitiva, en todos estos años la unidad de negocio del Grupo Reuters en España se ha ido transmitiendo de una empresa a otra, siendo mi representada la que actualmente ostenta los derechos y obligaciones de dicho negocio. Y ello incluye los derechos y obligaciones del contrato que se firmó con el demandado y los derechos de reproducción de sus fotografías, a lo cual nos referiremos posteriormente.

Por su parte, el demandado es un fotógrafo profesional que durante varios años ha colaborado con el Grupo Reuters como autónomo freelance.

Se acompaña como **DOCUMENTO Nº 6** impresión de la página web LinkedIn con la hoja personal profesional del demandado, donde se identifica como "Freelance Photography".

3

Cabe señalar que el nombre por el cual se conoce y se presenta el demandado es "Rafael Marchante", aunque se llama realmente Rafael Benítez Marchante. En esta demanda le denominaremos de una u otra manera pero es la misma persona.

**SEGUNDO. – EL CONTRATO ENTRE LAS PARTES**

Tal y como hemos adelantado en el Hecho Previo, las partes firmaron en fecha 11.07.05 un contrato de colaboración, que hemos aportado como Documento nº 1.

Cabe señalar que quien firmó el contrato en ese momento fue Reuters España, S.A. pero que el contrato ya preveía que los derechos y obligaciones alcanzaban a cualquier empresa del grupo Reuters.

En todo caso, el contrato establecía de forma resumida lo siguiente:

2.1.    Que el contrato se aplicaba a las fotografías que anteriormente el fotógrafo había hecho por encargo de una empresa del grupo Reuters, ya fueran simples fotografías o trabajos fotográficos. Cláusula 1.2:

*"Los siguientes términos y condiciones se aplicarán con efecto desde la fecha de la firma a todas las fotografías, ya sean "trabajos fotográficos" o "meras fotografías", que se hayan suministrado o se hayan realizado en el pasado durante un encargo de una empresa del Grupo Reuters, incluyendo las fotografías tomadas bajo la dirección o siguiendo instrucciones de Reuters o una empresa del Grupo Reuters o con equipo Reuters".*

2.2.    Que el fotógrafo se obligaba a entregar a Reuters las mejores fotografías realizadas en los nuevos encargos que le hacía Reuters. Cláusula 1.4:

*"Después de cada encargo, usted seleccionará en buena fe las Fotografías que en su opinión razonable sean las mejores Fotografías tomadas en dicho encargo y las suministrará a Reuters."*

4

2.3.    Que el fotógrafo daba licencia a Reuters para la explotación de dichas fotografías en el territorio mundial, durante el tiempo de duración del propio derecho de propiedad intelectual del fotógrafo. Cláusula 2.1:

*"Usted otorga a Reuters en beneficio propio o de cualquier empresa del Grupo Reuters, en toda la extensión permitida por la ley, una licencia de ámbito mundial para explotar los derechos de las Fotografías (en particular, reproducir, distribuidor, vender, alquilar, dar en préstamo, usar, editar y almacenar de forma electrónica o de cualquier otro tipo, exhibir y comunicar al público, transmitir, …) durante la duración del derecho de autor en las Fotografías, incluyendo el derecho a sublicenciar de forma exclusiva."*

2.4.    Que dicha licencia era exclusiva respecto a las "fotografías Reuters" y no exclusiva respecto a las sobrantes. Cláusula 2.2. Cabe señalar que las "fotografías Reuters" eran aquellas cedidas porque eran las mejores de cada encargo, y las sobrantes eran las restantes realizadas en cada encargo:

*"Los derechos concedidos conforme a la cláusula 2.1 son exclusivos para Reuters en relación a las Fotografías Reuters y no exclusivos respecto a las Sobrantes."*

2.5.    Que Reuters debía pagar unas regalías o royalties (en la presente demanda las denominaremos de una manera u otra indistintamente, dado que es notorio que en la práctica se usa principalmente el término royalties pese a que la palabra española adecuada es regalías) al fotógrafo por cada "venta" de una copia de una fotografía a un cliente de Reuters. Dicha regalía era del 25% del importe neto de las ventas, y se pagaba trimestralmente. Cláusulas 3.2 y 3.3:

*"Reuters le pagará o procurará que otra empresa del Grupo Reuters pague, un royalty. El importe se calculará mensualmente y será (sujeto a lo previsto en la cláusula 3.3) del 25% de las Ventas Netas. Ventas Netas significa …"*

*"El importe se pagará trimestralmente …"*

5

2.6.    Que el contrato duraría mientras el fotógrafo realizara fotografías por encargo de Reuters. Pero que en el momento de terminar el contrato respecto a dicha colaboración, los derechos de uso de las fotografías anteriores y las obligaciones de pago de regalías se mantendrían por el plazo pactado para ello (es decir por el tiempo de duración del propio derecho de propiedad intelectual). Cláusula 6:

*"Este contrato empezará en la fecha que ha sido firmada por ambas partes y continuará mientras se desarrollen encargos de Reuters o una empresa del Grupo Reuters como fotógrafo freelance. Si cesa el desarrollo de encargos de Reuters, los derechos a recibir los pagos de la cláusula 3 se mantendrán, igual que los derechos concedidos en la cláusula 2."*

2.7.    Que el contrato quedaba sometido a ley española y cualquier disputa debía resolverse ante los tribunales de Barcelona. Cláusula 8:

*"Este contrato se somete a las leyes de España y cualquier disputa en conexión con el mismo está sujeta a la jurisdicción de los tribunales de Barcelona."*

Como podemos observar, se trata de un contrato mixto con dos objetos distintos: un acuerdo de colaboración o prestación de servicios por el cual el fotógrafo se obligaba a acudir a los eventos que le encargara Reuters para hacer fotografías y entregarlas a Reuters, y una licencia exclusiva del derecho de reproducción de dichas fotografías.

**TERCERO. – ACUERDO DE RESOLUCIÓN DEL CONTRATO RESPECTO A LA PRESTACIÓN DE SERVICIOS**

En fecha 26.03.01 las partes firmaron un acuerdo de terminación del contrato de 2005, respecto a la colaboración o prestación de servicios. Es decir que el demandado dejaba de prestar servicios como fotógrafo freelance para el Grupo Reuters.

Se acompaña como **DOCUMENTO Nº 7** dicho acuerdo.

6

Cabe señalar que dicho acuerdo está firmado formalmente por Reuters News & Media Unipessoal LDA, que es la empresa del grupo Reuters en Portugal, porque el demandado residía en aquel momento y también actualmente en Portugal. No obstante, el acuerdo afecta a la relación del demandado con todas las empresas del grupo Reuters, incluida mi representada, tal y como se establece en el preámbulo:

*"Para la eficacia de las cláusulas de este acuerdo que beneficien a otra empresa del Grupo, la Sociedad firma como agente y representante de dicha empresa del Grupo."*

El acuerdo establecía de forma resumida lo siguiente:

3.1.    Que la relación de colaboración freelance se terminó el día 30.11.20. Cláusula 1.

3.2.    Que las partes no tendrán más relación, excepto en lo que se refiere al derecho de reproducción y royalties de las fotografías creadas en el ámbito del contrato de 11.07.05. Cláusula 2 y 13:

*"Las partes acuerdan que el Contratante deja de prestar servicios de fotografía a la Sociedad o a cualquier otra empresa del Grupo. Con la excepción de los derechos de autor y las regalías del Contratante por las fotografías creadas en el ámbito de los servicios prestados a Reuters, y los derechos y obligaciones del Contrato de Royalties de 11.07.05, el Contratante declara que no tiene nada que reclamar …"*

*"Las partes reconocen que este acuerdo establece toda la relación entre las partes y sustituye a todas las discusiones anteriores entre las partes, excepto en lo que atañe al Contrato de Royalty que se mantiene íntegramente en vigor."*

En definitiva, es evidente que el acuerdo tenía como objeto terminar la relación de colaboración o prestación de servicios como fotógrafo freelance, pero manteniendo expresamente los derechos y obligaciones respecto a las fotografías realizadas durante la relación mantenida conforme al contrato de 2005.

Cabe recordar que ello coincide con la propia previsión que ya tenía el contrato de 2005, respecto al mantenimiento de dichos derechos (uso de fotografías) y obligaciones (pago de regalías) si el contrato de colaboración terminaba en algún momento.

**CUARTO. – CONFLICTO DE LAS PARTES RESPECTO A LA VIGENCIA DE LOS DERECHOS DE REPRODUCCIÓN DE LAS FOTOGRAFÍAS**

A pesar de que los anteriores documentos eran claros y que el demandado, de forma expresa, reconocía el mantenimiento de los derechos de mi representada para reproducir y vender sus fotografías, con obligación de pagarle en cada caso regalías, ha existido en los dos últimos años un debate entre las partes al respecto, a partir de la base que el demandado pretendió realizar una terminación de ese acuerdo totalmente ilegal e inválida por tratarse realmente de un desistimiento unilateral inaceptable.

Dicho conflicto o debate parte de la carta remitida por el demandado a mi representada en fecha 30.04.21, es decir un mes después de haber firmado el acuerdo de finalización de la relación de prestación de servicios.

Se acompaña como **DOCUMENTO Nº 8** dicha carta.

En dicha carta, el demandado dice lo siguiente:

- La referencia es "*Denuncia del contrato de regalías para fotógrafos autónomos firmado en 11 de julio de 2005*". La palabra "denuncia" es imprecisa, porque en términos jurídicos la denuncia es la acusación de un delito realizada ante la policía o el juzgado, y no puede referirse al derecho civil.

- "*… a través de la presente procedo a la denuncia del contrato de regalías para fotógrafos identificado anteriormente, siendo esta rescisión con efectos en el 30 de mayo de 2021, fecha en la que dejará de tener efecto.*" A pesar de que vuelve a usar la palabra "denuncia", la cual no cabe en un contexto civil, usa demás la

8

palabra "rescisión", con lo cual parece que pretende rescindir unilateralmente el contrato.

Además de comunicar su decisión de rescindir el contrato, solicita a Reuters que le envíen un informe de todas las ventas realizadas de sus fotografías.

No obstante, observamos que el demandado no expone una causa o fundamento de su pretendida rescisión. No alega ningún incumplimiento, ni se remite a una cláusula concreta del contrato, ni cita una norma jurídica aplicable. Se limita a pretender comunicar su decisión unilateral de rescindir, lo cual jurídicamente equivale a un desistimiento unilateral del contrato.

Y ello es obviamente ilícito e ineficaz, porque el contrato no prevé que las partes puedan desistir de las obligaciones respecto a los derechos de las fotografías. Al contrario, tanto el contrato como el acuerdo de finalización de la prestación de servicios prevén expresamente que Reuters mantendrá los derechos de reproducción de las fotografías durante el plazo convenido (que era el mismo plazo que legalmente dure el derecho de reproducción del autor).

En definitiva, es indiscutible que dicha carta no podía tener efecto legal alguno.

Y sin embargo, posteriormente el demandado remitió diversas reclamaciones a mi representada insistiendo en que el contrato se había resuelto por dicha carta y que mi representada debía cesar en el uso de las fotografías.

Ello es lo que ha obligado a esta parte a presentar esta demanda. No podemos aceptar la insistencia de esta persona en una reclamación ilícita, basada en una carta ineficaz, cuando los derechos de mi representada siguen vigentes y no deben ser puestos en duda. De modo que necesitamos una declaración judicial que certifique frente al demandado la vigencia legal de esos derechos.

9

En concreto, las comunicaciones posteriores entre las partes que muestran ese conflicto son las siguientes:

4.1.    Email de 03.05.21 de la abogada Fatima Valadas, actuando en nombre de Rafael Marchante, dirigido a Reuters Portugal, con el que adjuntaba la carta de 30.04.21.

Observamos que en dicho email dice: "*adjunto la carta de terminación del contrato de royalties firmado entre las partes en julio de 2005*", sin más explicación. Obviamente, nos remitimos a los comentarios anteriores sobre la ineficacia de dicha carta y, por ende, de dicho email.

4.2.    Email de 26.05.21 de dicha abogada preguntando si Reuters había recibido el anterior email.

4.3.    Email de 29.05.21 de Katharine Larsen en nombre de Reuters, contestando que el contrato de royalties seguía vigente porque así lo habían pactado las partes, es decir rechazando la terminación de dicho contrato.

Se acompaña como **DOCUMENTO Nº 9** en bloque los tres emails citados anteriores.

4.4.    Email de 24.11.21 de Marcin Woroniwcki en nombre de Reuters, al demandado, indicando que el contrato sigue vigente y que le han enviado el informe de ventas y royalties que había pedido.

Se acompaña como **DOCUMENTO Nº 10** dicho email.

4.5.    Email de 05.08.22 de Rafael Marchante a Reuters, diciendo que el 30.05.21 envió la terminación por escrito del contrato y requirió a Reuters para cesar en el uso y explotación de sus fotografías, y que Reuters acusó recibo pero no cumplió el requerimiento, e insiste en que cesen en el uso inmediatamente.

4.6.    Email de 09.08.22 de Marcin Woroniwcki en nombre de Reuters, al demandado, recordando que ya le contestó el 24.11.21 que el contrato sigue vigente y no se ha terminado.

Se acompaña como **DOCUMENTO Nº 11** en bloque los dos anteriores emails.

4.7.    Email de 08.09.22 de Rafael Marchante contestando al anterior, insistiendo en que él terminó el contrato por escrito con efectos a 30.05.21 y por lo tanto Reuters no tiene derecho a reproducir las fotografías.

Se acompaña como **DOCUMENTO Nº 12** dicho email.

4.8.    Carta de 19.06.23 del abogado James H. Bartolomei, en nombre del demandado, alegando que el contrato se resolvió con la carta de abril de 2021 y que Reuters infringe los derechos de propiedad intelectual del demandado al usar sus fotografías a pesar de los requerimientos varios al respecto.

Se acompaña como **DOCUMENTO Nº 13** dicha carta.

4.9.    Carta de fecha 01.08.23 del abogado que firma la presente demanda en contestación a la anterior carta. En dicha carta insistimos, como no puede ser de otra manera, en que aquella carta de 30.04.21 era ineficaz y que por lo tanto el contrato sigue vigente.

Se acompaña como **DOCUMENTO Nº 14** dicha carta.

Como podemos observar, todas estas comunicaciones han seguido la misma tónica: el demandado y sus abogados pretenden que aquella carta de 30.04.21 sirvió para resolver el contrato y por lo tanto extinguió los derechos de Reuters, y en cambio Reuters alega en todo momento que aquella carta no fue válida y que los derechos contractuales se mantienen.

11

En la fundamentación jurídica de esta demanda analizaremos desde un punto de vista jurídico estas cuestiones, pero hemos dejado claro que en nuestra opinión, y de forma clara a la vista de los acuerdos firmados entre las partes, los derechos de reproducción de las fotografías siguen vigentes, junto con la correspondiente obligación de pagar regalías por su uso / venta, y que la carta de 30.04.21 no tuvo efecto alguno y las reclamaciones contrarias carecen de fundamento legal válido.

Finalmente queremos indicar que el conflicto no tiene ninguna relación con el reconocimiento del derecho de autor del demandado. Reuters siempre indica quién es el autor de las fotografías que tiene y vende, respetando el reconocimiento del derecho de autor. El demandado no se ha quejado ni ha presentado problema alguno con esta cuestión.

## QUINTO.- SOBRE EL ERROR MATERIAL EN LA CUANTÍA DE PARTE DE LOS ROYALTIES PAGADOS

Como puede observarse, en el email del demandado de fecha 08.09.22 y en la carta del abogado James H. Bartolomei de fecha 19.06.23 se hace referencia a un supuesto incumplimiento de Reuters por haber pagado incorrectamente los royalties al demandado.

En concreto, en la carta se afirma que entre los años 2005 y 2016, Reuters sólo pagó al demandado el 15% de las ventas como royalties, cuando lo pactado era el 25%. En el email sólo se acusa de haber pagado la mitad de los royalties, sin detalles.

Éstas son las únicas ocasiones en que el demandado o uno de sus abogados hace referencia a dicha cuestión, ya que en las anteriores comunicaciones nunca se había planteado un defecto en el pago de royalties.

Más aún, observamos que en el email de 08.09.22 el demandado pretende tergiversar los hechos, al afirmar que la resolución de abril de 2021 se debió a un supuesto incumplimiento de pago de royalties, y eso es falso.

Como ha quedado perfectamente acreditado, la carta de resolución es un estricto desistimiento unilateral sin causa. No se menciona ningún incumplimiento contractual ni se mencionan los royalties. Y en las siguientes comunicaciones de 2021 y todas las de 2022 hasta el 08.09.22 tampoco se mencionaba nada de ello. En consecuencia, es falso que la pretendida resolución se basara en un incumplimiento de mi representada.

Más aún: analizando la cronología indicada, observamos que en abril de 2021 es cuando se envió la carta de resolución inválida sin causa; que fue en noviembre de 2021 cuando mi representada envió al demandado la información sobre ventas y royalties pagados; y que fue en septiembre de 2022, es decir un año después, cuando por primera vez el demandado se queja de que hay un error y Reuters no le pagó los royalties en la cuantía correcta.

Es claro pues que ambas cosas no están vinculadas: la carta fue un intento de desistimiento unilateral sin causa, y otra cosa distinta muy posterior es si se descubrió un posible error en la cuantía de los royalties pagados, que podría suponer o no un incumplimiento parcial del contrato.

En todo caso, una vez aclarado que son dos cosas distintas y separadas y que las reclamaciones y el conflicto entre las partes se refieren a si la carta de abril de 2021 resolvió o no el contrato, y no se refieren a la cuantía de los royalties, debemos analizar si realmente hubo un error en los pagos de royalties y cuál es la consecuencia de ese hecho.

En este sentido, debemos indicar que efectivamente hubo un error cometido por el Grupo Reuters durante varios años, en que se pagó al demandado una cuantía de royalties incorrecta e inferior a la pactada. En concreto, se le pagó el 15% de las ventas, cuando debía ser el 25%.

13

En nuestra opinión, debemos hablar de error material, porque es obvio que nunca ha habido intención incumplidora de Reuters, ya que siempre se han pagado las regalías, pero simplemente ocurre que durante un tiempo el importe pagado no era el correcto.

En todo caso, advertido este error en los últimos meses, el Grupo Reuters ha procedido a subsanarlo, pagando al demandado ese importe que le faltaba recibir, es decir ese 10% adicional no pagado en su día.

Se acompaña como **DOCUMENTO Nº 15** el justificante de pago.

Se acompaña como **DOCUMENTO Nº 16** el listado de las ventas y regalías donde se detalla el cálculo del importe subsanado.

Esta parte ha procedido a dicho pago para subsanar el error cometido, y entendemos que dicho error fue simplemente eso, un error, y que no se puede interpretar como un incumplimiento contractual que pueda amparar una resolución de contrato.

No podría interpretarse como incumplimiento porque no ha habido un impago absoluto y esencial, sino un pago incompleto ahora subsanado.

Pero queremos dejarlo muy claro: en el improbable caso de que pudiera interpretarse aquel error como un incumplimiento suficiente para resolver el contrato, el demandado nunca ha resuelto formalmente el contrato (entendido como el acuerdo para la reproducción de las fotografías) por dicha causa. Nunca ha habido una comunicación donde el demandado simplemente manifestara que hay un incumplimiento y que en base al artículo 1124 Cc procede a resolver el contrato. Eso no ha existido.

En consecuencia, existiendo una prestación contractual cumplida de forma incompleta pero que ahora se ha subsanado, ya no existe posibilidad de que el demandado pueda pretender resolver el contrato por dicha causa.

14

E insistimos: el conflicto de los dos últimos años entre las partes respecto a la vigencia del contrato no deriva de ese posible incumplimiento, sino de la carta de desistimiento sin causa de abril de 2021, que es inválida.

Y finalmente, recordemos que ese error ahora subsanado es de royalties de un periodo anterior, no actual. En los últimos años sí se han pagado los royalties de forma correcta al 100%, y sin queja del demandado.

Se acompaña como **DOCUMENTO Nº 17** el justificante de pago en 2023 (se ha hecho un solo pago de los primeros trimestres porque el primero por sí solo no devengaba lo suficiente para un pago suelto), y como **DOCUMENTO Nº 18** el listado de royalties devengados y pagados en 2023. Cabe señalar que hay una diferencia por la retención de impuestos.

A los anteriores hechos son de aplicación los siguientes,

**FUNDAMENTOS DE DERECHO**

**I.- JURISDICCIÓN.** Es competente el Orden Jurisdiccional Civil con base a lo establecido en el artículo 9.2 de la Ley Orgánica del Poder Judicial (L.O.P.J), puesto que la materia que nos ocupa no está atribuida a otro Orden Jurisdiccional.

**II.- COMPETENCIA.** Es competente el Tribunal al que nos dirigimos de conformidad con la Cláusula Octava del contrato suscrito entre las partes, mediante el cual se acordó el sometimiento expreso a los Tribunales de Barcelona.
Y es competente el Juzgado de lo Mercantil conforme al artículo 86 bis LOPJ, por ser la materia tratada en este pleito el derecho de propiedad intelectual.

15

**III.- CAPACIDAD, REPRESENTACIÓN Y POSTULACIÓN PROCESALES.** Artículos 6, 7, 23 y 31 de la Ley Enjuiciamiento Civil.

**IV.- LEGITIMACIÓN.** Corresponde la legitimación activa a **REUTERS NEWS & MEDIA SPAIN, S.L.U.** por ser la titular del derecho cuyo reconocimiento se solicita en esta demanda.

Y corresponde la legitimación pasiva a **Don RAFAEL BENITEZ MARCHANTE** como autor de las fotografías que pone en duda la vigencia del derecho de mi representada.

**V.- CUANTÍA.** La cuantía de la presente litis es indeterminada, ya que no es aplicable ninguna de las reglas del artículo 251.1ª de la Ley de Enjuiciamiento Civil para su determinación.

**VI.- PROCEDIMIENTO.** Consecuencia de lo anterior, la acción debe tramitarse con arreglo a las normas del Juicio declarativo Ordinario pues conforme al artículo 249.2 de la Ley de Enjuiciamiento Civil, al tratarse de una demanda de cuantía indeterminada.

**VII.- FONDO DEL ASUNTO.**

Resultan de aplicación:

Reglas generales de las obligaciones: Artículos 1088, 1089, 1091, 1100, 1101, 1102, 1104, 1106, 1108 y concordantes del Código Civil, sobre obligaciones nacidas de los contratos, las cuales tienen fuerza de ley entre las partes y obligan a su cumplimiento.

Artículos 1254 y 1255 del Código Civil: A cuyo tenor existe contrato desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa o prestar algún servicio, pudiendo establecer los pactos, cláusulas y condiciones que tengan por conveniente.

16

Artículo 1258 del Código Civil: Que dispone que los contratos se perfeccionan por el mero consentimiento, y desde entonces obligan no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que, según su naturaleza, sean conformes a la buena fe, al uso y a la ley.

Artículo 1124 del Código Civil: Que faculta a quien cumple su obligación en las obligaciones sinalagmáticas o recíprocas para exigir la correlativa prestación a la parte que incumple, o la resolución de la obligación.

Es decir, que cuando hay un incumplimiento contractual, hay dos opciones: cumplir solucionando lo previamente incumplido y el contrato continúa, o resolver. De modo que no hay resolución automática, sino que sólo se resuelve si la otra parte lo decide y lo comunica formalmente.

Artículo 26 de la Ley de Propiedad Intelectual: Los derechos de explotación de la obra durarán toda la vida del autor y 70 años después de su muerte.

En consecuencia, ése es el plazo de duración de los derechos de reproducción que ostenta mi representada sobre las fotografías realizadas por el demandado en los encargos que recibió de Reuters y que cedió a Reuters.

Artículo 43 de la Ley de Propiedad Intelectual: Los derechos de explotación de la obra pueden transmitirse por actos inter vivos en las modalidades, el tiempo y el ámbito territorial que se determinen.

Artículo 45 LPI: Toda cesión de derechos deberá formalizarse por escrito.

Artículo 46 LPI: La cesión confiere al autor una participación proporcional en los ingresos de la explotación, en la cuantía convenida con el cesionario.

Artículo 48 LPI: La cesión en exclusiva deberá ser expresa.

Artículo 48 bis LPI: El autor podrá resolver la cesión en exclusiva si la obra no es explotada por el cesionario.

17

Alegamos este artículo a sensu contrario: si la obra sí es explotada por el cesionario, el autor no puede resolver la cesión de derechos. Dado que en este caso Reuters sí explota la obra, el autor no puede resolver esa cesión.

Artículo 128 LPI: El autor de meras fotografías podrá autorizar su reproducción, durante 25 años computados desde el día 1 de enero siguiente a la fecha de realización de la fotografías.

En consecuencia, las meras fotografías que pudiera haber hecho el demandado en encargos de Reuters y por lo tanto hubiera cedido a Reuters conforme al contrato que había, se pueden reproducir por Reuters durante 25 años.

En todo caso, entendemos que debe presumirse que todas las fotografías del demandado son obras fotográficas y no meras fotografías, porque es un fotógrafo profesional y cuando hacía fotografías por encargo de Reuters estaba prestando un servicio profesional.

Sentencia nº 135/2021 de fecha 14.07.21 dictada por el Juzgado de lo Mercantil nº 14 de Madrid.

Se trata de un pleito entre un fotógrafo profesional que tuvo con Reuters una relación de prestación de servicios como fotógrafo autónomo o freelance durante un tiempo, y luego una relación laboral. La relación de fotógrafo freelance era muy similar a la mantenida entre Reuters y el aquí demandado.

En aquel caso no existía un contrato escrito que detallara la cesión de derechos de las fotografías cuando era autónomo, pero aún así el juzgado declaró que debía interpretarse que la voluntad de las partes era la cesión del derecho de reproducción de dichas fotografías, porque el fotógrafo las hizo por encargos de Reuters y por lo tanto debe presumirse que eran para ser usadas en el negocio habitual de Reuters como agencia de noticias.

En nuestro caso sí existe un contrato que claramente prevé la cesión del derecho de reproducción, pero la sentencia es interesante porque viene a corroborar que la única interpretación razonable de una relación de Reuters con un fotógrafo freelance al que encarga que haga fotografías de eventos concretos, es que el fotógrafo le ceda los

18

derechos de reproducción de dichas fotografías para que Reuters los use en su negocio habitual.

**VIII.- COSTAS.**

Siendo la conducta del contrario la que ha llevado a mi representada a iniciar el presente procedimiento, procede la imposición de costas als demandado, aplicando por analogía la regla general del artículo 394 de la Ley de Enjuiciamiento Civil.

**IX.- AFORISMO DEL DERECHO.** "*Iura Novit Curia*" *y* "*Da Mihi Factum, Dabo Tibi Ius*".

En su virtud,

**AL JUZGADO SOLICITO**: Tenga por presentado este escrito, junto con los documentos que lo acompañan, se sirva admitirlos, y por formulada **DEMANDA DE JUICIO ORDINARIO** en nombre de **REUTERS NEWS & MEDIA SPAIN, S.L.U.** contra **Don RAFAEL BENITEZ MARCHANTE**, en reclamación del reconocimiento judicial de que está vigente el derecho de uso de las fotografías que realizó el demandado para mi representada durante el plazo en que mantuvieron un contrato de colaboración, más costas.

**OTROSÍ DIGO**: Que en el supuesto de que esta parte incurriese involuntariamente en algún defecto procesal, manifiesta su expresa voluntad de subsanación así como de cumplir con los requisitos exigidos por la ley en virtud del artículo 231 de la LEC.

**SUPLICO AL JUZGADO**: Que tenga por efectuada la anterior manifestación a los efectos oportunos.

En Barcelona, a 11 de octubre de 2023.