# EXHIBIT G
## to
## DECLARATION OF
## JAMES HENRY BARTOLOMEI III

December 6, 2023 hearing transcript

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------:

RAFAEL MARCHANTE,                 : Case No.: 23-CV-8864

                   Plaintiff, :

       v.                         :

REUTERS AMERICA LLC, et al. , : New York, New York

                   Defendant. : December 6, 2023

------------------------------:


TRANSCRIPT OF STATUS CONFERENCE HEARING

BEFORE THE HONORABLE DALE E. HO

UNITED STATES DISTRICT JUDGE



APPEARANCES:

For Plaintiff:          JAMES HENRY BARTOLOMEI, III PA
                        BY:  James H. Bartolomei, Esq.
                        809 West Third Street
                        Little Rock, AR 72201

For Plaintiff:          CERA LLP
                        BY:  Pamela A. Markert, Esq.
                        595 Market Street
                        San Francisco, CA 94105

For Plaintiff:          BRYAN DANIEL HOBEN
                        1112 Main Street
                        Peekskill, NY 10566


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.


AMM TRANSCRIPTION SERVICE - 631.334.1445

```
1                    APPEARANCES CONTINUED

2

3    For Defendant:        BALLARD SPAHR LLP
                           BY: Thomas Byrne Sullivan, Esq.
4                               Catherine Seibel, Esq.
                           1675 Broadway - 19th Floor
5                          New York, NY 10019

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    THE DEPUTY CLERK:  Good afternoon.  This
 2     is Nicole Morales, Judge Ho's Courtroom Deputy.  I'm
 3     just checking in to see who just entered the
 4     conference.
 5                    Hello?
 6                    MS. MARKERT:  Hi, this is Pamela Markert
 7     on behalf of plaintiff, Rafael Marchante.
 8                    THE DEPUTY CLERK:  Hello.  I also see
 9     another.
10                    MR. HOBEN:  Yeah, you also have Bryan
11     Hoben on behalf of plaintiffs as well.
12                    THE DEPUTY CLERK:  Afternoon to you both.
13                    MS. MARKERT:  Our colleague, James
14     Bartolomei, will be joining, and he will be speaking
15     on behalf of plaintiffs.
16                    THE DEPUTY CLERK:  Awesome.  Thank you so
17     much.  Do you know if Solomon Cera will be joining?
18                    MS. MARKERT:  He will not.
19                    THE DEPUTY CLERK:  Not, okay.  Thank you
20     so much.
21                    Good afternoon.  I see two people just
22     entered the conference.  Just checking in to see who
23     has come in.
24                    MR. SULLIVAN:  Hi.  Good afternoon.  My
25     name is Thomas Sullivan, Ballard Spahr LLP, for the
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    defendants.

2              MR. BARTOLOMEI:  Good afternoon.  This is

3    James Bartolomei, and I am counsel for plaintiff,

4    Rafael Marchante.

5              THE DEPUTY CLERK:  Good afternoon to you

6    both.

7              Mr. Sullivan, do you know if Ms.

8    Catherine Seibel will be joining?

9              MR. SULLIVAN:  Yes, I believe she also

10   intends to join.

11             THE DEPUTY CLERK:  Okay.  Just wanted to

12   make sure.  Thank you so much.

13             MR. SULLIVAN:  You're welcome.

14             THE DEPUTY CLERK:  Good afternoon.  I'm

15   just checking to see who just entered the

16   conference.

17             Hello?

18             MS. SEIBEL:  Hi, this is Catherine

19   Seibel, counsel for the defendants, on behalf of

20   Ballard Spahr.

21             THE DEPUTY CLERK:  Hi, good afternoon.  I

22   believe that is everyone.  As long as you're all

23   ready, I can bring the judge into the conference.

24             MR. BARTOLOMEI:  Ma'am, are there any

25   other lawyers that have -- represent the plaintiffs

1    that have -- in a waiting room, or --

2                    THE DEPUTY CLERK:  Somebody just popped

3    out but came back on.

4                    MS. MARKERT:  Yes.  In an attempt to mute

5    myself, I actually permanently muted myself and had

6    to dial back in.

7                    Jim, both Bryan and I are on, on behalf

8    of the plaintiffs, with you.

9                    THE DEPUTY CLERK:  Okay.  So we're all

10   ready then?

11                   MR. SULLIVAN:  Yes.  There's no one else

12   from the defendants.  Defendants are ready.  Thank

13   you.

14                   THE DEPUTY CLERK:  Okay.  Great.  All

15   right.  Just give me a moment.

16                   The judge has entered the conference, so

17   we can begin.  The Honorable Dale E. Ho presiding in

18   the matter of Marchante v. Reuters America, LLC, et

19   al; Docket Number: 23-cv-8864.

20                   Counsel, can you please state your names

21   for the record, starting with the plaintiffs.

22                   MR. BARTOLOMEI:  Good afternoon, Your

23   Honor.  This is James Bartolomei from the Duncan

24   firm, and I represent Rafael Marchante.

25                   MS. MARKERT:  Pamela Markert from Cera,

1   LLP, and I also represent plaintiff, Rafael

2   Marchante.

3          MR. HOBEN:  This is Bryan Hoben from

4   Hoben law, and I also represent plaintiff, Rafael

5   Marchante.

6          MR. SULLIVAN:  Good afternoon, Your

7   Honor.  This is Thomas Sullivan, Ballard Spahr, LLP

8   on behalf of the defendants.

9          MS. SEIBEL:  Good afternoon.  This is

10  Catherine Seibel, also Ballard Spahr, also on behalf

11  of the defendants.

12         THE DEPUTY CLERK:  Counsel, this is a

13  reminder that this is a public proceeding.  Members

14  of the public and press can access the proceeding

15  with a public dial-in number.  Please be aware that

16  just as if you were physically present in the

17  courtroom, you are prohibited from recording,

18  rebroadcasting or disseminating any recording of

19  court proceedings, including this one.

20         Your Honor.

21         THE COURT:  Good afternoon, and thank

22  you, everyone, for joining this teleconference.

23         We're here on defendant's motion to stay

24  discovery pending resolution of their motion to

25  dismiss, which hasn't been fully briefed yet.  I

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    want to hear from the parties, and I think the way

2    I'd like to proceed is, I'd like to first start with

3    the plaintiffs to give me a very quick overview of

4    the case and what discovery it is that you're

5    seeking.

6          And then maybe I'll come to the

7    defendants after that, and you can say whatever you

8    want in response to the plaintiffs in terms of their

9    overview of the case.  And tell me why you think a

10   stay of discovery would be appropriate.  And then

11   I'll probably come back to the plaintiffs after

12   that, and I'll have questions for each of you along

13   the way.  And if there's anything else you want to

14   address after we've gone through all that, then I'll

15   give you an opportunity to do so.

16         One housekeeping matter before we get

17   going.  We don't have a court reporter, but this is

18   being recorded so that if anyone wants a transcript

19   later, you can have a court reporter transcribe it.

20   But one thing that's helpful in that process is if

21   folks could always say their name when they start

22   speaking, that'll make it a lot easier to produce a

23   clean transcript.  That is, unless I say your name

24   first when inviting you to speak, in which case, I

25   think the transcript will be perfectly clear.

1           So with that, why don't we get started.

2      And I don't know who's going to want to speak for

3      the plaintiffs.  So this is one of those occasions

4      where it would be nice to say your name before you

5      start speaking.  But why don't I start with counsel

6      for the plaintiff, and just give me a quick overview

7      of the case and a sense of the kind of discovery

8      that you're seeking.

9           MR. BARTOLOMEI:  Good afternoon, Your

10     Honor.  It's a pleasure to be before your court.

11     This is James Bartolomei, and I'll be speaking on

12     behalf of the plaintiffs today.

13          To start with Your Honor's first request,

14     this case is, you know, very simply, a copyright

15     infringement case for U.S. copyright infringement

16     claims for conduct solely in the United States

17     against two U.S. Reuters defendants.

18          My client, Rafael Marchante, is an

19     award-winning professional photographer that has

20     been -- he was a wire service photographer for over

21     20 years.  He provided services to Reuters starting

22     first, I believe, in Spain.  He spent a number of

23     years in Morocco.  He spent a number of years in

24     Portugal.  Spent some time in the Middle East,

25     Africa.  And captured roughly 20,000 photographs

1   during that time period.  One of the good things in

2   this case is that he owns the copyright to each of

3   these photos, so that element of copyright

4   infringement is not in dispute.

5              Sometime in late 2020, because of

6   COVID -- and when I use the term "Reuters," I'll try

7   to be specific, but generally he had a freelance

8   royalty agreement, which provided that Reuters had

9   basically three requirements throughout the entirety

10  of his time of service, which started in 2002 and

11  ended in 2020.

12             So during that time period, Reuters was

13  required to pay him royalties, basically 25% of the

14  net sales of any photographs that he captured.  They

15  were required to pay him on time, they were required

16  to pay him in full, and they were required to

17  provide him backup statements during that time.

18             So during the entire 20-year period,

19  despite asking, he was never ever provided royalty

20  statements.  And one of the challenges when you're

21  working for a big media conglomerate like Reuters is

22  if you rock the boat and you do too many things and

23  ask too many questions, they're going to get rid of

24  you.

25             And in any event, when he was terminated,

1   he began suspecting that he had not been paid his
2   royalty payments, partly because he never even had a
3   copy of the royalty statements that were required to
4   be provided.  So roughly, I don't know, six or seven
5   times after asking, he had sent a termination notice
6   to Reuters.  Sometime -- I'm talking about Reuters,
7   Spain -- sometime in April of 2021, notifying them
8   that he was terminating the royalty agreement.  And
9   eventually, during the next two years, he determined
10  that they had materially and essentially breached
11  this royalty agreement, which effectively terminates
12  Reuters' license.
13          And to be specific, Reuters created this
14  royalty agreement.  They're the ones -- I believe
15  discovery would show that somebody within their UK
16  office -- because it's written in English -- in the
17  United Kingdom office, perhaps drafted this royalty
18  agreement.  It's written in English, and that the
19  royalty agreement was really meant to compensate him
20  for the sale of the -- the after-sale of these
21  photographs, which, over a 20-year period, he wasn't
22  making that much money.  He was probably making
23  about 3- or 4,000 U.S. dollars at most at any given
24  time.
25          And this was an agreement that was meant

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    to compensate him for that.  So he sent notice of
2    termination.  Reuters -- I think counsel out of
3    Poland went back and forth and communicated with
4    him.  And eventually Reuters' response was, it's not
5    terminated, the contract is still valid, we still
6    have a license to your photographs.
7             It wasn't until he decided sometime this
8    past summer to engage counsel in the United States
9    to say, listen, I've got this issue with Reuters.
10   They are exploiting my photographs in the United
11   States.  We've got hundreds and hundreds of licenses
12   that were sold to U.S. entities in New York.  And,
13   invariably, they're committing copyright
14   infringement.  They're exploiting my photographs,
15   and they no longer have a valid license.
16             So here we are, we filed suit, I believe,
17   on October 9 of this year.  Two days later, Reuters
18   filed, in response to that suit, our suit here in
19   the U.S., their own case in Spain, through a Reuters
20   entity.  That's sort of the high level overview.
21   We've got 20,000 photographs at issue.  All of them
22   are subject to copyright infringement claims here in
23   the U.S.  There's a sister statute, as Your Honor
24   may know, the copyright management information
25   violations under the DMCA, which plaintiff is also

1    making claims for.

2             And so the Court knows by and large, both

3    parties, including plaintiffs, have the lion's share

4    of documents that will prove on its face that

5    Reuters materially breached this agreement.

6             Now, the real question comes down to what

7    exactly else is out there in the universe of

8    discovery.  So I think there's really two buckets of

9    categories of discovery, one of which is all going

10   to be in the time period for infringements in the

11   U.S.  And the rest basically is some e-mails, some

12   royalty payments, which we have all the backup

13   statements for, and communications internally

14   between Reuters' witnesses that are probably all

15   based in either the U.K. or Poland or the United

16   States for that matter.

17            So there's actually very little to do

18   with Spain in terms of the buckets of evidence

19   required in this case to allow discovery to proceed,

20   of which the only real witness that we think is

21   germane to any of those issues is our client, Mr.

22   Marchante.  And aside from that, we think that

23   discovery is not overly complex.  This is, I hate to

24   call it a garden variety copyright infringement

25   case.  The only wrinkle here is that there's a

1    question of the materiality of the breach of the

2    licensing agreement, which is a fact question.  And

3    there's also -- I would submit as an affirmative

4    defense that's really never appropriate to be raised

5    on the motion to submit level.

6            So, invariably, plaintiff does not

7    believe that there's really that much discovery to

8    be done.  And we suggested six months in the

9    proposed scheduling order, which Reuters agreed to,

10   but truth be told, we could probably do it in less

11   time if we had to.

12           And, you know, with that, Your Honor,

13   I'll take any questions or -- that's all I have on

14   that.

15           THE COURT:  Okay.  I think I understand

16   your views and have at least a sense now of what

17   discovery is going to be involved in this case.  I'm

18   sure I'm going to have questions for you later.

19           But why don't I turn to counsel for the

20   defendants.  And I don't know if it'll be Mr.

21   Sullivan or Ms. Seibel, but I'll invite you to also

22   give a brief overview of the case to the extent that

23   you want to, but I'm most interested in why you

24   think a stay of discovery would be appropriate right

25   now.

```
 1              MR. SULLIVAN:  And, Your Honor, this is
 2   Mr. Sullivan, and I'll be addressing this for the
 3   defendants.
 4              First, on the background of the case and
 5   the discovery required, this is fundamentally a case
 6   about Spanish issues.  While the plaintiff has
 7   chosen to sue two Reuters American entities, he
 8   himself is a Spanish citizen.  He took the majority
 9   of the photographs in either Spain, Portugal or
10   Morocco.  His relationship was with Reuters Spanish
11   affiliate, not either of the American affiliates.
12              And the major factual issues in the case
13   are going to concern how those royalties were paid
14   that plaintiff's counsel addressed, and his contract
15   relationship with Reuters, which was with Reuters
16   Spanish entity.
17              So while we agree that with respect to
18   electronic discovery, Reuters, in order to
19   facilitate and make this case go forward more
20   easily, you know, is not going to stand on
21   distinctions between the various Reuters corporate
22   entities.  The witnesses in this case are almost
23   exclusively going to be in Spain.  The plaintiff is
24   in Spain.  The photo editors who assigned the
25   plaintiff to various photo assignments were in
```

 1    Spain.  The editorial operations manager, who both
 2    calculated the royalties and paid them, is in Spain.
 3    That is the locus of this action.
 4         The fundamental question here is, under
 5    Spanish law, did the plaintiff have the ability to
 6    terminate the contract because a material breach
 7    occurred, and did he follow the required procedures
 8    to terminate the contract if he determined there was
 9    a material breach?  All of that really comes down to
10    questions of what Spanish law allows, and the
11    communications that he made to Reuters Spanish
12    affiliate.  That's whom the termination letter was
13    sent to.
14         So in our view, the focus of this case
15    really is on Spain.  You know, as the plaintiff's
16    counsel has said, it will be a straightforward
17    discovery process.  As he acknowledged, they've
18    requested a longer than usual discovery period in
19    this case, longer than under this Court's sample
20    discovery order.  And even if the discovery would
21    involve entities other than Spain, like the U.K., as
22    they mentioned, that too calls for this case to be
23    heard in Spain.  It's much closer jurisdiction, much
24    closer geographically than the United States.
25    Poland as well.

1          So that's our view on the scope of

2    discovery.  Unless the Court has questions on that,

3    I can go into the motion itself.

4          THE COURT:  Yeah, that's fine, and we

5    can.  Just one quick question.  I thought I

6    understood from Mr. Bartolomei, and maybe I

7    misunderstood, that the length of the requested

8    discovery period in the case management plan wasn't

9    something that the plaintiffs thought was necessary.

10   That that was something that the parties came to an

11   agreement on, but the plaintiffs thought they could

12   get it done in, you know, a more standard four

13   months or so.

14          Is that wrong?  Do you have a different

15   view as to how long discovery in the case should

16   take?

17          MR. SULLIVAN:  I think in our view, there

18   are potential complications in -- when doing

19   interpretation of the witnesses, getting the

20   witnesses here or traveling there, or figuring out

21   the logistics of that.  But no, my point was simply

22   that plaintiffs had agreed to that extended

23   discovery period, so they were not suggesting that

24   it was a shorter period of time.  It was also not in

25   our initiative that the discovery period had been

```
1    longer.  I had suggested shorter deadlines
2    originally.
3              THE COURT:  I understand.  Okay.  Thank
4    you, Mr. Sullivan.
5              Let's turn to the motion first.
6              MR. BARTOLOMEI:  Your Honor, may I also
7    respond to your question regarding the six-month
8    issue?
9              THE COURT:  Is that Mr. Bartolomei?
10             MR. BARTOLOMEI:  It is.  I'm sorry, Mr.
11   Bartolomei.
12             THE COURT:  Sure.  But briefly, please,
13   because I want to let Mr. Sullivan -- I want to get
14   to the motion.
15             MR. BARTOLOMEI:  No, understood.  And
16   typically, under the Court's model order, four
17   months is generally relatively short.  So plaintiff
18   would not oppose or object to reducing it to four
19   months if we had to.
20             THE COURT:  Oh, was that -- okay.
21             Is that it, Mr. Bartolomei?
22             MR. BARTOLOMEI:  Yes.  Correct, yes.
23             THE COURT:  Understood.
24             Mr. Sullivan, turning back to you.
25             MR. SULLIVAN:  Thank you -- excuse me.
```

1   Thank you, Your Honor.

2               I wanted to start by just discussing the

3   sort of procedural issues that the plaintiff raised

4   in his opposition letter yesterday.

5               First of all, we believe this is properly

6   raised by a discovery letter.  A motion to stay

7   discovery is effectively a motion for a protective

8   order under Rule 26.  And Local Rule 37.2 requires a

9   motion under Rule 26 to be brought by a request for

10  an informal discovery conference like this one.

11              Second, this is not a motion for

12  reconsideration of any order previously issued by

13  the Court.  There was prior letter briefing in this

14  case, as plaintiffs allege, but that letter briefing

15  was on two other topics.  Our request for an

16  extension of time to answer and for a bifurcated

17  briefing schedule on our motion to dismiss.  We did

18  not seek a stay in that briefing, and the Court

19  didn't order that there was to be no stay.

20              In the memo endorsement, granting that

21  letter motion in part, the Court apprised the

22  parties that pendency of any motion to dismiss does

23  not generally provide cause to stay discovery.

24  We're not arguing here that every motion to dismiss

25  requires a stay of discovery, but rather the

1    specific circumstances here justify it.

2              And then finally, on the meet and confer

3    requirement, the fact that plaintiffs disagree with

4    our reason for seeking a stay doesn't mean that we

5    failed to meet and confer.  We did, and we simply

6    reached an impasse where it's appropriate to bring

7    it before the Court.

8              On the motion itself, we believe good

9    cause exists for a stay, as outlined in our letter.

10             First of all, as the Second Circuit held

11   in the *TransUnion* case, because the lack of a stay

12   here would effectively moot the purpose of our forum

13   non conveniens, as well as our comity portions of

14   our motion, we believe it's appropriate to receive a

15   stay here.

16             If the case proceeds, the defendants

17   would lose the benefit of that motion because they'd

18   be forced to litigate in a forum they believe is

19   inconvenient, and that the case should be more

20   appropriately held in Spain.  It would defeat the

21   purpose of the motions.

22             On the three factors; first, on

23   discovery, we've discussed that a bit already, but

24   we believe that discoveries sought here will be

25   broad and burdensome.  Fundamentally, this is a case

1    about Spain and what happened there.  Royalties were
2    calculated and paid in Spain, and the witnesses
3    involved in that are Spanish.

4            In addition, in discussing whether any
5    breach was material, the parties are necessarily
6    going to need to conduct discovery into other ways
7    in which the plaintiff is compensated.  For example,
8    under the freelancer agreement, he also received
9    assignment fees.  Those were also paid in Spain.

10           And plaintiff's counsel, in discussing
11   the background of the case, acknowledged that he
12   intends to seek additional areas of discovery, such
13   as the drafting and creation of the royalty
14   agreement itself, which would also be burdensome and
15   likely involve some privilege issues that this party
16   would have to litigate.

17           At the end of the day here on discovery
18   issues, Reuters Spain was the counterparty, and the
19   party to whom the termination letter was addressed.
20   And discovery will necessarily involve issues
21   involving Reuters Spain that are based in Spain.

22           On the second factor, the strength of the
23   motion, I think it's clear from a read of our motion
24   that it is potentially dispositive.  If it was
25   granted on any of the three grounds, this case would

1    end in its entirety or on the comity ground, it

2    would be stayed in its entirety pending disposition

3    of the Spanish action.  And it, at the very least,

4    appears not to be unfounded in the law.  That's the

5    standard in the three cases cited in our letter, the

6    *Alafa View*, *Integrated Systems & Power*, and *NIV*

7    cases.  Plaintiff cites a different standard in the

8    *Kaplan* case, that a strong showing that plaintiff's

9    claim is unmeritorious.

10           That standard, as *Kaplan* cites, comes

11   from the *Hong Leong Financial Limited v. Pinnacle*

12   *Performance* case; that's 297 F.R.D. 69.  It's from

13   this District in 2013, Judge Gorenstein.  And in

14   that case, Judge Gorenstein acknowledged that courts

15   in the Second Circuit have, "often stated that a

16   stay of discovery is appropriate where a motion does

17   not appear to be without foundation in law."

18           While Judge Gorenstein disagreed with

19   that and used the strong showing standard instead,

20   he acknowledged that he was imposing a different

21   standard than other judges in this court have done.

22           And even under plaintiff's preferred

23   formulation, we've met that showing here.  Plaintiff

24   cites other arguments they believe we could have

25   raised but don't actually address the arguments

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    made.  They largely, simply state the conclusion

2    that they think they're not sufficient.

3            On the question they raise about a

4    declaration that a Spanish court could adjudicate

5    U.S. copyright claims, they cite no case law in

6    support of the proposition that such a declaration

7    is required, and the law is actually to the

8    contrary.  For example, earlier this year, a judge

9    of this court rejected an argument that a Portuguese

10   court was not an adequate forum because U.S. courts

11   had exclusive jurisdiction over U.S. copyright

12   claims.  That's *Paulo versus Agence France-Presse*,

13   2023 Westlaw 2707201 S.D.N.Y., March 30, 2023.

14   Plaintiff's counsel are familiar with that case.

15   Two of them litigated it, so they're familiar with

16   the idea that that is simply not the law in the

17   Southern District that U.S. copyright claims need to

18   be litigated to the intellectual property basis, not

19   whether U.S. law explicitly could be litigated in a

20   foreign jurisdiction.

21           The other thing I want to say about

22   *Kaplan* is that it's a very, very different case from

23   this one.  In Kaplan, because of various procedural

24   wrangling, the plaintiff had been waiting 14 years

25   for discovery, an extended delay, much more extended

1    than the several months we're talking about here.

2    There have been numerous prior rulings on the

3    sufficiency of the pleadings where the Court had

4    found they were sufficient.  And in that case, the

5    defendants were seeking a stay, not while a motion

6    to dismiss in that case was pending, but while there

7    was a motion to dismiss pending in a sister case

8    where some of the discovery wouldn't be overlapping.

9    So none of those factors are existent here.

10            Third and last, on the unfair prejudice

11   factor, there would be no unfair prejudice if a

12   temporary stay is put in place while the Court

13   considers the motion.  If granted, as I noted

14   before, the motion will dispose of the entire case.

15   Therefore, it will not substantially or unduly

16   delay, but rather avoid unnecessary duplication of

17   effort.

18            This motion, based on the currently

19   existing briefing schedule will be briefed by the

20   end of January.  So less than two months from now,

21   and less than two months from when the motion was

22   filed.  That's not a very long period of time.

23   Plaintiff waited nearly two years to file any claims

24   after he says he was aware of them.  So a two-month

25   delay is not substantial based on that.

```
 1                   And the number of remaining arguments
 2       they make in their opposition brief on this issue,
 3       on the prejudice issue, don't discuss why a stay
 4       would be prejudicial.  Instead, they discuss why
 5       they believe Spain is not a convenient forum.  But
 6       that is not the test here.  It's whether a stay is
 7       prejudicial while the motion is pending.
 8                   On the specific factors, while plaintiff
 9       makes accusations about forum shopping, the
10       freelancer agreement states that the Spanish court
11       in Barcelona is an appropriate forum for disputes
12       arising out of the contract.  It's where all the
13       parties intended for any dispute to be heard.
14       Plaintiff has chosen to bring a U.S. copyright claim
15       here.  While that's the jurisdictional provision,
16       the agreement is not exclusive, he can hardly argue
17       that it's a surprise to be hauled into Spanish court
18       based on the contract.
19                   Plaintiff has not substantiated his
20       claim.  He is unable to hire Spanish counsel.  To
21       our knowledge, he was previously represented by
22       Portuguese counsel in this dispute, and he's
23       obviously been able to hire American counsel here.
24       To the extent an inability to hire counsel goes to a
25       forum non conveniens analysis, the Second Circuit
```

1    has also rejected that as being a determinative

2    factor.  It's just one factor in the analysis; and

3    that's in the *Murray v. BBC* case.

4              So for all of these reasons and the

5    reasons stated in our letter, we believe a stay

6    would be appropriate here to allow the Court time to

7    rule on the party's motion -- or the defendant's

8    motion, avoid unnecessary duplicative effort, and we

9    do not believe it would be prejudicial to the

10   plaintiff.

11             THE COURT:  Thank you, Mr. Sullivan.

12             Well, one question about the burden of

13   discovery.  The sense I get from you is that all of

14   the key witnesses are in Spain.  The plaintiffs, in

15   their letter opposing your motion for a stay, say

16   that all of the documents that are at issue here are

17   readily accessible here.

18             And do you agree with that?  Do you

19   disagree with that?

20             MR. SULLIVAN:  So they may not be

21   physically in the United States.  They may be in

22   Spanish servers or, based on the way Reuters sort of

23   structures its businesses, they may actually be in

24   even a third country.  But as plaintiffs represent,

25   we are not intending to force them to do subpoena

1    practice or letters rogatory to obtain those

2    documents.

3              To the extent the greater Thompson

4    Reuters Company has those documents, we will produce

5    them as if they were documents held by Reuters U.S.

6    entities.

7              THE COURT:  So the documents -- sorry, go

8    ahead, Mr. Sullivan.

9              MR. SULLIVAN:  With respect to -- so,

10   yes, that's what I was trying to say.  Sorry.

11             THE COURT:  The documents can be accessed

12   here from the United States.  There's no, at least

13   as far as we know right now, physical document

14   collection that has to occur abroad.

15             MR. SULLIVAN:  That's correct.  There is

16   one category of documents on some of the assignment

17   fees just because of how far back we go, and we

18   raised this with plaintiff in our conference in

19   advance of this conference.  You know, it's possible

20   some of the assignment fee documents are not

21   available electronically.  We have not found some of

22   them yet.  So if there are paper documents, they

23   would exist in Spain.  I don't know if they exist or

24   not, but those would be the paper documents that

25   occur to me that could exist and would be in a

1    Spanish office somewhere.

2              THE COURT:  Okay, but the witnesses are

3    abroad, in Spain?

4              MR. SULLIVAN:  The witnesses are abroad.

5    Mr. Marchante's supervisors at various times are in

6    Spain, as is the person who calculated the royalty

7    payments and made sure it actually got paid.

8              THE COURT: Okay.  Thank you.  I

9    appreciate that and your clear explanation of your

10   position.

11             I'd like to come back to Mr. Bartolomei

12   for the plaintiff.  And the question I want to pose

13   to you is what prejudice your client will suffer if

14   we have a relatively short period of a stay in

15   discovery?  The motion will be fully briefed in a

16   little over a month, and I can't make any promises

17   on my end for as to how quickly I will resolve it.

18   But assuming that I could resolve it in a reasonably

19   expeditious time, what's the harm to your client

20   waiting for the starting gun for a couple of months,

21   maybe three months before the start of discovery,

22   particularly in light of the fact that you've been

23   aware of the conduct underlying the complaint for a

24   few years at this point?

25             MR. BARTOLOMEI:  So there's a lot to

1    unpack of what Mr. Sullivan previously mentioned.
2    But I'll focus on what the Court has asked.
3          The prejudice is one, the case in Spain
4    filed against Mr. Marchante, which we're not Spanish
5    lawyers, is such that this is a tactical advantage
6    in which they had equally as much time knowing that
7    this issue was pending.
8          And given the fact that if this is meant
9    to give Reuters a head start in Spain, to
10   potentially try and go adjudicate something where
11   plaintiff does not have the means to fully litigate
12   this issue in Spain will effectively allow Reuters
13   to unfairly control this litigation.  Because the
14   fact is, Mr. Marchante hasn't even been served in
15   Spain, and the burden for him to go litigate --
16          So to correct a few misstatements by Mr.
17   Sullivan, Mr. Marchante lives almost nine hours by
18   train from where this court is located, which is
19   effectively, roughly --
20          THE COURT:  If I may, Mr. Bartolomei, and
21   I want to allow you to address that.  But leave
22   aside the -- I know it's kind of hard to do that,
23   given that it is the reality, but just leaving aside
24   for a moment the other case that's happening, and
25   just the question of -- and I know that the motion

1   is based on forum non conveniens, but is that the

2   only harm to your client, I guess, is what I'm

3   trying to get at.  Is there something else that is

4   problematic from your perspective, other than that

5   delaying the start of discovery would prejudice your

6   client in some way?

7          MR. BARTOLOMEI:  No, Your Honor.  I mean,

8   at the end of the day, prejudice in and of itself is

9   not the end all be all when it comes to the Court's

10  discretionary power to grant a stay or not grant a

11  stay.

12         So to the extent that several months is

13  something that the Court is contemplating, then my

14  client will live with it.  I mean, that's just the

15  reality.

16         THE COURT:  Okay.  I understand.  Thank

17  you.  And please, I interrupted you, so I want to

18  allow you to continue with the next point that you

19  wanted to make.

20         Mr. Bartolomei, did you hear me?

21         Mr. Bartolomei?

22         MS. MARKERT:  Your Honor, this is Pamela

23  Markert, also on behalf of the plaintiffs.  I'm not

24  sure what happened.

25         MR. BARTOLOMEI:  Your Honor, I'm back on.

```
 1    I don't know why the call dropped.
 2                    THE COURT:  Oh, no worries.
 3                    MR. BARTOLOMEI:  I apologize.
 4                    THE COURT:  No, it's not your fault.  So
 5    I had said that I had interrupted you.  You wanted
 6    to make some more points about, I guess, your
 7    position that the defendants are forum shopping and
 8    what disadvantage that would put your client at to
 9    litigate in Spain, I think is where you left off.
10                    MR. BARTOLOMEI:  Yeah.  What I would
11    suggest is that the fact that they've filed a
12    second -- when I say "they," Reuters Spain, not even
13    one of these U.S. Reuters defendants, which they
14    could have easily done that if they believed that
15    they were trying to adjudicate their rights.  But
16    putting that aside, filing the second lawsuit in
17    Spain would give them a leg up on plowing forward
18    with that litigation to the detriment of being
19    effectively stuck in the mud here.
20                    And I'm sure Your Honor is well aware
21    from the way this game is played, is that if a
22    defendant can stay or stop or pause or delay a case,
23    and there's plenty of case law, you know, that will
24    be put before Your Honor in terms of the prejudice
25    suffered, including the *Paulo* case, including the
```

1    *Wave* case that's cited -- *Wave Studio* case that's
2    cited in the defendant's motion to dismiss, that we
3    could be talking about years before this issue --
4              If the Court does decide to punt the case
5    back to Spain, right now all a stay is going to do
6    is give Reuters an advantage in Spain to try to
7    proceed while my client, who has limited means and
8    was not required to put forth all sorts of
9    affidavits in a response to a discovery dispute
10   letter to say, listen, I'm going to be starting
11   behind the eight ball.  My case was filed first.
12   We're not getting this moving.
13             I mean, at the end of the day, Your
14   Honor, the docket and getting on his trial calendar
15   is our number one goal as a plaintiff always.  And I
16   know the Court was very respectful that, with all
17   the best intentions, we could see a ruling in six,
18   nine months, even a year.  I know the Court doesn't
19   have any control over that.  And fully respectful
20   that you have a very busy docket with thousands of
21   cases.
22             THE COURT:  Well, again, I don't want to
23   make promises on the precise timing in which I can
24   rule on the motion.  I haven't seen the opposition
25   yet, and I know I have to weigh the strength of the

1    motion as one of the factors here.  And that's a

2    little bit difficult given that I only have one

3    side's take on it at this point.  But I feel

4    reasonably confident in telling you that it's not

5    going to be a year before you get an opinion.

6              And I guess, Mr. Bartolomei, are you

7    aware of any case law in which the prejudice

8    asserted by the plaintiff in opposition to a motion

9    for discovery was the possibility of forum shopping

10   that another case might get ahead of the one before

11   the Court where the discovery stay is sought?

12             MR. BARTOLOMEI:  Not offhand, but I don't

13   know that case law is going to speak to just the

14   optics of -- plaintiff files a case here in the

15   U.S., and literally 48 hours later, Reuters decides,

16   with all the infinite resources that they

17   practically have, a company that's probably worth

18   $60 billion-market cap, could go file suit two days

19   later in Spain.

20             So I'm happy to provide the Court that

21   additional supplemental case law to the extent it

22   exists.  But this feels like it's gamesmanship at

23   its best and meant to gain a tactical advantage to

24   harm plaintiff, where he's just going to be

25   scrambling to try to defend himself on what is

1     effectively a declaratory relief action in Spain.

2            THE COURT:  Your client hasn't been

3     served in Spain yet; is that right?

4            MR. BARTOLOMEI:  No.  That's correct.

5     And my understanding is that the Spanish courts,

6     having talked to Spanish counsel, you know, because

7     we anticipate that we would put forth the legal

8     standard in Spain, which defendants -- I know the

9     Court hasn't had a chance to look at defendant's

10    motion, but one of the things that we've anticipated

11    is that we're going to have to rely on Spanish

12    counsel.

13           And our understanding that the court

14    system there has been on strike off and on, and one

15    of the quorum nonfactors is, can a litigant get a

16    fair shake at moving his case through that country's

17    court system?  And the fact is, is here we are two

18    months later, and he hasn't even been served.

19           THE COURT:  Well, Mr. Bartolomei, that

20    suggests to me that if I can resolve the motion to

21    dismiss expeditiously, that it's unlikely that the

22    Spanish case, in the event I were, say, to deny the

23    motion, that the Spanish case would get ahead of

24    this one.

25           MR. BARTOLOMEI:  Probably not.  But I'm

1    not entirely familiar with the timing in terms of,

2    let's just say hypothetically, my client is served

3    tomorrow, and if he's got to respond within 30 days

4    or whatever, I don't know that.  I have to rely on

5    Spanish counsel -- but I don't want to speak out of

6    turn -- but, you know, the fact is that there is

7    going to be a tactical advantage time wise if we're

8    left having to litigate on both fronts.

9            And I think there's actually a more

10    impractical, more important issue here is that,

11    without the benefit of a fulsome response by

12    plaintiff, one of the plaintiff's positions is that

13    the Spanish court is not competent to hear all the

14    claims at issue here.  It may be competent to hear

15    the materiality, the breach of contract and

16    termination issue, but, you know, the fact remains

17    is that there is nothing in defendant's moving

18    papers, either in their motion to stay, or their

19    motion to dismiss that speaks to that issue that the

20    Spanish court is even competent to hear U.S.

21    copyright infringement claims other than, oh, Spain

22    has copyright laws.

23            That's just not enough.  That's not

24    enough to just put one conclusory line in there.

25    And, you know, at the end of the day, defendant's

1    motion is weak.  It's not substantiated because the

2    Spanish court can't hear all the claims there.

3              THE COURT:  All right.  Mr. Bartolomei,

4    I'll take whatever arguments that you want to make

5    on the merits of the motion to dismiss at the time

6    that you file your opposition.

7              But one thing that you said just confused

8    me a little bit.  I thought this was a contract

9    rather than a copyright issue.  Am I

10   misunderstanding something?

11             MR. BARTOLOMEI:  So the underlying

12   premise, if we back up, plaintiff has pled in his

13   complaints that there is copyright infringement in

14   the U.S. against these Reuters defendants because

15   they do not have a valid license, therefore, it is

16   infringement.

17             This is not a breach of contract case,

18   but the underlying premise to reach infringement is

19   to make a determination that there is a fact

20   question for a jury to decide that a breach

21   occurred, that plaintiff was justifying and

22   terminating it -- of terminating this license, and

23   that, therefore, at that point in time in which the

24   termination is effective, and it's our position that

25   it happened somewhere between April 21 and when this

1    lawsuit was filed, and that's going to be one of the

2    things that Your Honor may have to determine.

3    Defendants make much hay out of all the conduct that

4    happened prior to the termination.

5            But the crux of the argument is that

6    Reuters is going to admit that they didn't pay this

7    guy for a lion's share of the contract.  They're

8    going to admit that they never gave the guy royalty

9    payments during the term of the contract.  So the

10   whole premise of copyright infringement is premise

11   that defendants don't have a valid license, and that

12   is an affirmative defense that they have to --

13   that's a fact question.  It's not appropriate for a

14   motion to dismiss.

15           THE COURT:  Okay.  Thank you for

16   clarifying.  I appreciate that.  And I apologize for

17   my confusion.

18           I just want to clarify one other thing.

19   I asked Mr. Sullivan if he agreed with the

20   characterization that the documents are accessible

21   from the United States, but the witnesses are in

22   Spain, and I just want to see if there's consensus

23   on that.

24           Is that your take on discovery as well,

25   that the document collection and review and

1  production can all occur here in the United States,

2  but any actual discovery with respect to live

3  witnesses would have to take place in Spain?

4         MR. BARTOLOMEI:  No, plaintiffs do not

5  agree with that characterization.  The fact is that

6  almost nothing from the documents that I have in my

7  possession -- I just looked at some this morning --

8  not a single payment for royalties was made from a

9  Spanish entity or a Spanish bank account.  It all

10 came from the United Kingdom.  In fact, all the

11 transmittals either came from Reuters' employees in

12 London or Reuters' employees in Lisbon, in Portugal.

13 Not even Spain, which is several -- probably 10

14 hours away by train.

15         So at the end of the day, there are no

16 witnesses that are germane to the payment of

17 royalties.

18         Now, one thing Mr. Sullivan also

19 mentioned is the issue of assignment fees.

20 Assignment fees -- maybe I'm missing something here.

21 The assignment fees, which are the daily payments,

22 100 euros or whatever they're paying Mr. Marchante

23 to go take the photographs, which was just a flat

24 rate to go take the photographs, that is not even a

25 piece of evidence that's at issue here as it relates

1    to the breach.  There is no claims related to those

2    assignment fees.  So that is an absolute red

3    herring.  It's irrelevant whether those were paid

4    from Spain or elsewhere.

5               And the fact of the matter is that Mr.

6    Marchante didn't even live in Spain for more than

7    half of the time during his 20-year tenure.  So to

8    suggest that there are Spanish photo assignments

9    that gave him -- or photo editors that gave him

10   assignments wherever he was in the world at the time

11   is wholly irrelevant to whether they paid him

12   royalties.

13              THE COURT:  I'm sorry.  Mr. Bartolomei,

14   I'm sorry, my question, and I may have led you

15   astray, in which case I apologize.  I'm just trying

16   to get a sense for where the witnesses are.  So Mr.

17   Sullivan says that they're in Spain.  You say

18   they're not.  Where do you think the witnesses are

19   that are relevant to this case?

20              MR. BARTOLOMEI:  So plaintiff's position

21   is that the only relevant witnesses in this entire

22   case is in -- that's in Spain is Mr. Marchante.

23   Determination witnesses, all the communications came

24   from some lawyer in Poland.  All the royalty

25   payments came from witnesses that were based in the

```
1    U.K.  All the infringement activity and any
2    communication between U.K. Reuters, Poland Reuters,
3    U.K. would all probably be in New York, where
4    Reuters has a large presence.
5              And as the Court may already be aware,
6    Reuters isn't challenging personal jurisdiction
7    here.  So by and large, we're talking about a small
8    universe of electronic documents that can be
9    accessed here in the United States with witnesses,
10   Mr. Marchante, which at the end of the day, we will
11   make him available wherever we have to make him
12   available.  And almost no witnesses from plaintiff's
13   perspective that will be disclosed in our initial
14   disclosures, if we get that far today, which we
15   believe we should, are going to show that there's
16   any witnesses in Spain.
17             THE COURT:  Okay.  Thank you, Mr.
18   Bartolomei.
19             I think I have everything that I need
20   from the parties to resolve the defendant's motion
21   to stay.  But I'll just give you an opportunity
22   briefly to raise any other additional points that
23   you want.
24             We just left off with Mr. Bartolomei, so
25   why don't I go to Mr. Sullivan first.
```

1          MR. SULLIVAN:  I just wanted to clarify,

2  Your Honor, on the question of why the assignment

3  fees are relevant.

4          In our view, that goes to whether the

5  breaches were material, if we get to that point,

6  because the assignment fees were, in our view, the

7  most significant portion of the plaintiff's

8  compensation.  So it goes to whether the royalty

9  missed payments were actually a material breach, as

10  that term is defined under Spanish law.  That's why

11  we think it would be relevant.  I mean, even if

12  plaintiff doesn't think it's relevant, we would

13  still be seeking discovery into that area because we

14  think it's relevant to our defense.

15          THE COURT:  I understand.  Okay.

16          Anything else, Mr. Sullivan?

17          MR. SULLIVAN:  No, that's it.

18          Just on the forum shopping position, we

19  think the forum shopping argument is a red herring

20  because both parties agreed when they drafted this

21  contract that the Spanish court in Barcelona was an

22  appropriate forum.  It is strange to hear plaintiffs

23  complain about being sued in a jurisdiction he

24  agreed to be sued in for the claims underlying this

25  dispute.

```
 1                     So with that, that's all I have to say.
 2                     THE COURT:  Thank you, Mr. Sullivan.
 3                     Mr. Bartolomei?
 4                     MR. BARTOLOMEI:  Thank you, Your Honor.
 5                     So obviously, point of contention.  Mr.
 6       Marchante is well aware that the royalty agreement,
 7       and it's really a license, has a forum collection
 8       clause that is not exclusive.  One of the things
 9       that Reuters' Spanish lawyers put was that the
10       Spanish court is the exclusive jurisdiction.  So
11       there is knowingly misleading information in that
12       suit that if Mr. Sullivan and counsel here in the
13       U.S. are going to rely on that, I would suggest that
14       they take a hard look, that there's really no merit
15       to that argument.
16                     But the more practical argument is that
17       Mr. Marchante is not sophisticated.  He does not
18       understand the fact that U.S. federal courts have
19       exclusive jurisdiction over U.S. copyright
20       infringement claims.  And I know Your Honor does not
21       have the benefit of the full briefing, but at the
22       end of the day, to the extent that if we look at the
23       Wave Studio case, that's a case that got filed in
24       New York, went to Singapore for like four years, and
25       now is finally coming back to adjudicate the U.S.
```

1    infringement claims.

2              Mr. Sullivan mentioned the *Paulo v.*

3    *Agence France-Presse* and *Getty Images* case.  That's

4    a case in which I am one of the lead counsel in that

5    case.  And what made that case a little bit

6    different is that there was a pending labor dispute

7    in Portugal at the time that related to the

8    ownership of the photograph, about half of the

9    photographs at issue.  And that's a good example of

10   a case in which the Portuguese court is going to be

11   asked to determine whether they can hear U.S.

12   copyright infringement claims.

13             And not to get too far afield, but we

14   believe that the Spanish court is not competent to

15   hear all these claims, and it's not outside the

16   bounds to go file suit in the only and best forum,

17   which is the Southern District of New York for U.S.

18   infringement claims against U.S. defendants.

19             THE COURT:  Okay.

20             MR. BARTOLOMEI:  And I think that is all

21   for the plaintiffs at this time, unless the Court

22   has any other questions.

23             THE COURT:  Okay.  Thank you, Mr.

24   Bortolomei.  I don't have any other questions.  I

25   really appreciate everyone's time.  We'll try to get

1    the motion resolved as expeditiously as possible.

2                        Thank you, all, very much.

3                   MR. BARTOLOMEI:  Thank you, Your Honor.

4                   MR. SULLIVAN:  Thank you, Your Honor.

5

6                             0o0

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  C E R T I F I C A T E

 2

 3        I, Adrienne M. Mignano, certify that the

 4   foregoing transcript of proceedings in the case of

 5   Marchante v. Reuters America LLC, et al; Docket

 6   Number: 23CV8864 was prepared using digital

 7   transcription software and is a true and accurate

 8   record of the proceedings.

 9

10

11   Signature   _Adrienne M. Mignano_

12              ADRIENNE M. MIGNANO, RPR

13

14   Date:      December 21, 2023

15

16

17

18

19

20

21

22

23

24

25
```